855 So.2d 33 (2003)
Lloyd DUEST, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-2366.
Supreme Court of Florida.
June 26, 2003.
Rehearing Denied September 8, 2003.
*37 Martin J. McClain, Special Assistant Public Defender, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Melanie Ann Dale and Celia A. Terenzio, Assistant Attorneys General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Duest appeals a death sentence imposed at the conclusion of a new penalty phase after the previous sentence of death was vacated. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the sentence of death.

FACTS AND PROCEDURAL HISTORY
This Court's opinion in Duest's direct appeal set forth the following facts:
On February 15, 1982, defendant was seen by witnesses carrying a knife in the waistband of his pants. Subsequently, he told a witness that he was going to a gay bar to "roll a fag." Defendant was later seen at a predominantly gay bar with John Pope, the victim. The two of them then left the bar in Pope's gold Camaro. Several hours later, Pope's roommate returned home and found the house unlocked, the lights on, the stereo on loud, and blood on the bed. The sheriff was contacted. Upon arrival, the deputy sheriff found Pope on the bathroom floor in a pool of blood with multiple stab wounds. Defendant was found and arrested on April 18, 1982.
Duest v. State, 462 So.2d 446, 448 (Fla. 1985). A jury instructed on both felony murder and premeditated murder found Duest guilty of first-degree murder in a general verdict, and the trial court sentenced him to death. This Court affirmed the judgment and sentence, concluding that there was sufficient circumstantial evidence of premeditation based on the following evidence:
The record reflects that defendant had stated he gets his money by "rolling gay guys" and that he intended to do the same on the day that the victim was murdered. Defendant was seen with the victim at a gay bar immediately prior to the murder and was seen leaving the bar with the victim in the victim's car. Shortly thereafter, defendant was seen driving the victim's car alone. At that time, witnesses saw blood stains on the sleeve of his jogging suit. The victim's stolen jewelry case was also seen in the car which was being driven by defendant after the murder. Moreover, on the day of the murder, defendant had in his possession a seven-inch knife. The cause of death in this case was multiple stab wounds. We find that there was sufficient circumstantial evidence to sustain defendant's conviction of premeditated murder.
Id. at 449. This Court also approved the trial court's finding of the aggravating circumstances that the killing was cold, calculated and premeditated (CCP), and especially heinous, atrocious, or cruel (HAC). See id.[1] As to CCP, this Court stated:
In finding that this aggravating circumstance applied, the trial court found:
Evidence adduced at trial indicated that defendant informed witness Demezio *38 some two days prior to the murder that he brings homosexuals back to their apartments, beats them up, and takes their money or jewelry. Defendant on the day of the murder went to his temporary residence with the victim, went into the closet where Demezio kept a dagger and left the residence with John Pope, Jr., the victim. The dagger was later discovered missing, and John Pope, Jr. was later discovered at his home, dead. His car and jewelry box were missing.
We find that the evidence supports the finding that the homicide was committed in a cold, calculated, and premeditated manner.
Id. at 449-50. As to HAC, this Court noted:
The evidence presented at trial shows that the victim received eleven stab wounds, some of which were inflicted in the bedroom and some inflicted in the bathroom. The medical examiner's testimony revealed that the victim lived some few minutes before dying.
Id. at 449. This Court subsequently affirmed the denial of a motion for postconviction relief and denied a petition for a writ of habeas corpus. See Duest v. Dugger, 555 So.2d 849 (Fla.1990). The United States Court of Appeals for the Eleventh Circuit vacated the death sentence based on the reversal, subsequent to the judgment of guilt and imposition of sentence in this case, of a Massachusetts conviction that had been used to support the aggravating factor of previous conviction of a violent felony. See Duest v. Singletary, 997 F.2d 1336 (11th Cir.1993).[2]
On resentencing, the trial court instructed the jury on four aggravating circumstances: (1) the murder was committed in the course of a robbery or for pecuniary gain, (2) Duest was previously convicted of a crime of violence, (3) the murder was especially heinous, atrocious or cruel, and (4) the murder was committed in a cold, calculated and premeditated manner without the pretense of moral or legal justification. The court also instructed the jury on fourteen nonstatutory mitigating factors, but denied requests for an instruction on statutory mitigators. The jury recommended death by a ten-to-two vote. The trial court found three of the four aggravating factors submitted to the jury, but rejected CCP. The court found no statutory mitigating circumstances and twelve nonstatutory mitigating circumstances.[3] The court sentenced Duest to death.
*39 In his appeal to this Court, Duest raises eleven issues,[4] which we address as follows.

BRADY[5] CLAIM
In his first issue, Duest asserts that the testimony in the new penalty phase by medical examiner Dr. Ronald Wright as to the manner of the victim's death constitutes material, exculpatory evidence unlawfully withheld by the State. In his 1983 testimony at deposition and trial in this case, Dr. Wright testified that the victim was initially attacked both on his bed and in the bathroom, and died soon after a final blow in the bathroom, and that death would have occurred from ten to fifteen seconds to no more than five minutes after the stab wound to the right side of the heart. After reviewing the evidence, including crime-scene photographs, Dr. Wright testified in the 1998 penalty phase that the evidence showed that the stab wounds were inflicted only in the bedroom and that the victim then made his way to the bathroom, where he collapsed and died. Dr. Wright also testified in the new penalty phase that the victim was alive and conscious for fifteen minutes or longer after the attack and might not have died from his injuries had he promptly telephoned for emergency medical help. Duest claims that this change in testimony shows that the assailant left the victim alive and therefore calls into question the intent to kill, requiring a new trial on his guilt of first-degree murder.
We conclude that Duest's challenge to the murder conviction, which became final in 1985, is not properly before this Court in an appeal from the reimposition of a death sentence after the previous death sentence was vacated. Duest did not object to the testimony below, instead impeaching Dr. Wright on his change in testimony from 1983 to 1998. Nor has Duest filed a motion for postconviction relief asserting that the change in testimony constitutes either undisclosed exculpatory evidence or newly discovered evidence entitling him to a new trial.[6] The absence of a pending motion for postconviction relief distinguishes this case from Way v. State, 630 So.2d 177 (Fla.1993), in which this *40 Court reversed the summary denial of a motion for postconviction relief raising a Brady claim and withheld ruling on the direct appeal from resentencing pending disposition of the postconviction motion. Id. at 179. In recognition of Duest's efforts to raise this issue during the direct appeal, our affirmance is without prejudice to Duest raising the issue in the trial court via Florida Rule of Criminal Procedure 3.851 after this appeal.

EVIDENCE AND INSTRUCTION ON RESIDUAL DOUBT
Duest asserts that the trial court erred in precluding the defense from impeaching witnesses whose identifications of Duest helped establish his commission of the murder and accompanying robbery, and in denying an instruction that the jury could consider "lingering doubt" in rendering its advisory sentence. The trial court disallowed evidence indicating that Duest was in Massachusetts at the time of the murder in Fort Lauderdale. Duest sought to present this evidence to impeach the state witnesses who testified that on the day of the murder, they saw Duest with Pope and then later saw Duest in possession of Pope's car and jewelry box. In finding Duest guilty of the murder, the jury in Duest's 1983 trial rejected an alibi defense based on the same theory.
This Court has held that a defendant's right to present evidence challenging an aggravating circumstance may not be used to relitigate the guilt determination through the introduction of evidence suggesting lingering or residual doubt. See Way v. State, 760 So.2d 903, 916 (Fla. 2000); Waterhouse v. State, 596 So.2d 1008, 1015 (Fla.1992). In Waterhouse, this Court ruled that the trial court, which had allowed a defendant convicted of felony murder to present evidence during the penalty phase that no sexual battery occurred, appropriately precluded cross-examination of state witnesses and presentation of evidence that would have called into question the defendant's guilt of the murder. See 596 So.2d at 1015. Similarly, in Way, we ruled that the trial court did not abuse its discretion in allowing the defense to question police witnesses in an attempt to establish that a fire had not been intentionally set, relevant to the "murder in the course of a felony" aggravator, but precluded questioning on the adequacy of the police investigation, an issue resolved against Way when he was convicted of arson at trial. See 760 So.2d at 918.
We conclude that in this case, the trial court correctly applied the law in determining that the alibi evidence was inadmissible. Duest's alibi was not relevant to rebut the robbery/pecuniary gain aggravating circumstance. Additionally, Duest was not prevented from presenting evidence that the murder of Pope did not occur during the commission of a robbery. The trial court's ruling was limited to the exclusion of testimony that merely relitigated the failed alibi defense under the guise of impeachment on an aggravating circumstance. Therefore, Duest was not denied his right to present evidence or to confront adverse witnesses on the aggravating circumstance of the contemporaneous robbery.
On the denial of the related jury instruction, this Court has repeatedly held that lingering or residual doubt is not a valid nonstatutory mitigating circumstance, and that a defendant has no right to an instruction thereon. See Darling v. State, 808 So.2d 145, 162 (Fla.2002) (explaining that this Court has followed United States Supreme Court precedent holding that a defendant has no right to present evidence of lingering doubt); Sims v. State, 681 So.2d 1112, 1117 (Fla. 1996) (concluding that the trial court did *41 not err in declining to instruct the jury on imperfect self-defense as a mitigating circumstance); see also Franklin v. Lynaugh, 487 U.S. 164, 173-74, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (rejecting the argument that the Eighth Amendment requires a capital sentencing jury to be instructed that it can consider lingering doubt evidence in mitigation). Therefore, the trial court did not err in denying the instruction in this case.

REJECTION OF STATUTORY MITIGATION
Duest next asserts that the trial court erred in denying his requests for jury instructions on the statutory mental mitigating circumstances of extreme mental or emotional disturbance and impaired capacity, and in rejecting these mitigators in its sentencing order. The decision whether to give a particular jury instruction is within the trial court's discretion. See Card v. State, 803 So.2d 613, 624 (Fla. 2001). In ruling on requests for instructions on mitigating circumstances, the trial court's exercise of discretion is guided by precedent holding that a defendant is entitled to have the jury instructed on a mitigating factor if there is any evidence to support the instruction. See Bryant v. State, 601 So.2d 529, 533 (Fla.1992).
The trial court summarized the evidence bearing on both mitigating factors in its sentencing order:
The Defense presented witnesses to testify to the circumstances of the Defendant's childhood deprivation and brutalization within his family and in the prison system as a young adult. Dr. Patricia Fleming testified that she had occasion to evaluate the Defendant on December 8, 1989, and, as a result of that evaluation determined that the Defendant suffered from low self-esteem, was shy and introverted, and later became addicted to drugs and abused alcohol. She also discussed that he had some type of brain dysfunction as an infant, but could not determine what, or to what extent, this impaired the defendant in any way. Dr. Fleming's findings that the Defendant had suffered physical or emotional abuse by his father were confirmed by the testimony of the Defendant's father, mother, and the Defendant's siblings, most notably, Nancy Kerrigan. Dr. Fleming's analysis of the impact on the Defendant's mental or emotional health was based only upon various studies published about the institution and not upon any circumstances confided to her by the Defendant.
The Defense also called John Boone, former Commissioner of Corrections for the State of Massachusetts. Mr. Boone testified to the deplorable conditions that existed at Walpole and Concord prisons during the years that the Defendant was incarcerated at these facilities. Mr. Boone related that he had met the Defendant once and that the Defendant had told him he had "problems." Mr. Boone referred him to the appropriate personnel, and did not have any further contact with or information about this Defendant. This testimony presented vividly depicted the general conditions that he (Mr. Boone) observed in that prison system, but he could not enlighten these proceedings with any specifics as to the Defendant's "problems."
....
[Impaired capacity]
In addition to the testimony regarding abuses suffered by the Defendant as set forth above, the Defense also argues that this statutory mitigator exists because of the testimony regarding the Defendant being under the influence of alcohol and/or drugs at the time of the crime.... [T]here was certainly evidence *42 that the Defendant had used drugs and alcohol for a period of time before the crime, and had consumed some alcohol just prior to the commission of the crime....
On the mental or emotional disturbance statutory mitigator,[7] there was no evidence that Duest was under an extreme mental or emotional disturbance at the time of the killing. In Geralds v. State, 674 So.2d 96, 101 (Fla.1996), this Court found that the trial court did not err in declining to instruct on this mitigator because a psychotherapist who testified on the defendant's mental disorders did not comment on the defendant's "actual or probable mental condition at the time of the murder as contemplated by the statute." In Geralds, we distinguished the three cases now relied upon by Duest: Bryant v. State, 601 So.2d at 532-33, Stewart v. State, 558 So.2d 416 (Fla.1990), and Smith v. State, 492 So.2d 1063 (Fla.1986). See Geralds, 674 So.2d at 101 n. 12. We concluded that "[i]n each of those cases, some evidence was presented that the defendant was either under the influence of some drug around the time of the murder, or suffered from a pervasive mental condition that affected him every day." Id. In this case, although there was evidence that Duest had consumed drugs and alcohol several nights before the murder and consumed a mixed drink on the afternoon of the murder, there was no evidence of Duest's probable mental state at the time of the murder, and no evidence of a pervasive mental condition that affected him every day. Thus, the trial court did not abuse its discretion in finding that Duest was not under the influence of extreme emotional or mental disturbance at the time of the killing.
Nor did the trial court abuse its discretion in denying the instruction on the impaired capacity mitigator,[8] despite evidence that Duest had a history of drug abuse, including addiction to heroin, and testimony that he used drugs and alcohol near the time of the crime. Evidence of consumption of intoxicating substances, without more, does not require an instruction on this mitigator. See Cooper v. State, 492 So.2d 1059, 1062 (Fla.1986). However, in Stewart v. State, 558 So.2d at 420-21, we held that the trial court erred in denying an instruction on impaired capacity based on the defendant's history of chronic alcohol and drug abuse, and on a doctor's opinion that at the time of the shooting, the defendant was drunk and his control over his behavior was reduced by his alcohol abuse. See id. at 420-21. Here, there was evidence of long-term drug abuse and consumption of intoxicants by Duest in the hours preceding the crime, but no evidence indicating that he was substantially impaired at the time of the murder or that his ability to control his behavior was reduced by drug or alcohol abuse.
Additionally, the instructions on being under the influence of drugs or alcohol and on mental or emotional disturbance, given by the trial court in lieu of the standard instructions on the statutory mitigators, placed the consideration of Duest's mental state before the jury in terms consistent with the evidence of previous mental and emotional disturbances and heroin addiction as well as Duest's drug and alcohol *43 use at around the time of the crime. The court instructed the jury:
Amongst the mitigating circumstances you may consider if established by the evidence are any aspect of the defendant's character, background or record and any other circumstances of the offense including but not limited to, ... [t]wo, the defendant was under the influence of drugs or alcohol at the time the offense was committed. Three, the defendant was under mental or emotional disturbance at the time the offense was committed.
The court did not suggest that the jury should give these mitigating factors any less weight than if the court had instructed the jury in the language of the corresponding statutory mitigators.[9] We therefore find no error in the trial court's decision not to instruct the jury on the statutory mitigators found in section 921.141(6)(b) and (f), Florida Statutes (2002).
Similarly, the trial court did not abuse its discretion in declining to find the existence of these statutory mitigating factors in its order sentencing Duest to death. The decision as to whether a mitigating circumstance has been established is within the discretion of the trial court. See Bowles v. State, 804 So.2d 1173, 1183 (Fla. 2001); Blackwood v. State, 777 So.2d 399, 409 (Fla.2000). We reject Duest's claim that by stating in its order that the testimony of defense psychologist Dr. Patricia Fleming regarding mental mitigation was not based upon any circumstances confided to her by Duest, the trial court erroneously imposed a requirement that a mental mitigator must be supported by disclosures from the defendant. We conclude that this statement is consistent with the trial court's task of determining whether mitigating factors are supported by the evidence. Cf. Griffin v. State, 820 So.2d 906, 913 (Fla.2002) (requiring the trial court to expressly evaluate, in its written order, each proposed mitigating circumstance for evidentiary support). The fact that Dr. Fleming used sources other than Duest in forming her opinion was a valid consideration in the trial court's assessment of the weight of the evidence in support of the proffered mitigators. Based on this determination and our discussion of the trial court's refusal to instruct the jury on the mental mitigators, we conclude that the trial court did not err in finding that these mitigating circumstances were not applicable to Duest.
Duest also asserts error in the denial of an instruction on the mitigating circumstance that the victim was a participant in the defendant's conduct or consented to the act.[10] Our resolution of this issue is governed by Wuornos v. State, 676 So.2d 972 (Fla.1996), in which this Court rejected the argument that by seeking the services of a prostitute, the murder victim had assumed the risk of harm, justifying a finding of this mitigating circumstance. We stated:
By its plain language, the statute permits this factor only where: *44 The victim was a participant in the defendant's conduct or consented to the act.
§ 921.141(6)(c), Fla.Stat. (1989). It would be absurd to construe this language as applying whenever victims have engaged in some unlawful or even dangerous transaction that merely provided the killer a better opportunity to commit murder, which the victim did not intend. What the language plainly means is that the victim has knowingly and voluntarily participated with the killer in some transaction that in and of itself would be likely to result in the victim's death, viewed from the perspective of a reasonable person. An example would be two persons participating in a duel, with one being killed as a result. The statute does not encompass situations in which the killer surprises the victim with deadly force, as happened here under any construction of the facts.
Id. at 975. These observations apply with equal force to the acts of Pope, the victim in this case, in picking up Duest in a bar and taking him home. As in Wuornos, the evidence shows that Duest surprised the victim with deadly force, rendering the mitigator of victim participation in or consent to the murder inapplicable. Additionally, Pope's failure to promptly seek medical treatment did not make him either a participant in the deadly attack or evince his consent to the murder. A construction of section 921.141(6)(c) making the failure to seek medical care tantamount to consent to or participation in the murder would be no more justified than the construction of the provision we rejected in Wuornos. Because there was no evidence from which the jury could lawfully have found that the victim participated in the conduct resulting in his death, the trial court properly denied the instruction.

CCP INSTRUCTION
Duest next claims that the trial court erred in instructing the jury on the aggravating circumstance of a homicide committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification (CCP). We have held that a judge should instruct a jury only on those aggravating circumstances that are supported by credible and competent evidence. See Hunter v. State, 660 So.2d 244, 252 (Fla.1995). CCP can be established by circumstantial evidence. See Woods v. State, 733 So.2d 980, 991 (Fla.1999).
In Hunter, as in this case, the trial court instructed the jury on CCP but found in its sentencing order that the aggravating factor was not proven beyond a reasonable doubt. See 660 So.2d at 252 & n. 10. This Court found the jury instruction adequately supported by evidence that the defendant "deliberately and successively fired bullets from a handgun into four human beings lying helplessly on the ground without any apparent reason or justification." Id. at 252. In Guzman v. State, 721 So.2d 1155, 1162 (Fla.1998), this Court disapproved a CCP finding in a sentencing order based on a stabbing of a victim during a robbery. The defendant told witnesses that when the victim awoke during a motel room robbery, the defendant struck and stabbed the victim ten or eleven times with a samurai sword that the defendant found in the room. See id. This Court concluded that the murder was "neither calculated nor committed with heightened premeditation," but instead was "an extemporaneous action intended to eliminate a potential witness to the theft." Id.
In this case, Duest discussed plans to pick up a homosexual man in a bar, accompany the man to his residence and then rob him. There was evidence from which the jury could have concluded that after *45 being picked up in a bar by Pope, Duest returned to an apartment where he was staying and obtained a knife, then went with Pope to Pope's residence. The evidence introduced during the new penalty phase showed that Pope was stabbed twelve times while on his bed, and that some of the wounds were inflicted in his back and some were defensive in nature. After the stabbing, Duest took Pope's jewelry and car.
Although the trial court concluded that this circumstantial evidence did not establish CCP beyond a reasonable doubt, we determine that the evidence nevertheless reached the threshold of credible and competent evidence on the elements of CCP, which we have defined as follows:
[T]he jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted). This Court approved the trial court finding of CCP in Duest's direct appeal from his judgment and sentence, on virtually the same evidence presented in his resentencing hearing, specifically the prearranged plan to beat up and rob a gay man and Duest's act of returning to his temporary residence to obtain a knife while in the victim's company. See Duest, 462 So.2d at 449-450. Dr. Wright's testimony in the new penalty phase, that Pope was attacked only in his bedroom, remained alive and conscious for at least fifteen minutes, and might have survived had he promptly sought treatment, does not warrant a different conclusion. Under the testimony elicited in the 1998 penalty phase, the evidence of Duest's "state of mind, intent and motivation," which are the focuses of CCP, remains materially the same as in Duest's first sentencing proceeding. See Brown v. State, 721 So.2d 274, 277 (Fla.1998) (distinguishing pertinent considerations for HAC and CCP). We therefore find no error in the CCP instruction given to the jury over defense objection.

HAC FINDING
In his next issue, Duest asserts that the trial court erred in finding that the killing was especially heinous, atrocious, or cruel (HAC). On this aggravator, the trial court found:
In considering the evidence applicable to this aggravator, the testimony given by Dr. Ron Wright, the Medical Examiner who conducted the autopsy and testified at the penalty phase was crucial. Dr. Wright was qualified as an expert witness, and advised that Mr. Pope had suffered twelve stab wounds, that Mr. Pope suffered massive blood loss, that he remained conscious for as long as fifteen or twenty minutes after the attack, and thus felt the pain of the stabbing. In Dr. Wright's opinion, Mr. Pope was attacked while lying on the bed, and he thereafter stumbled into the bathroom, where ultimately, he died by drowning in his own blood.
Mr. Pope was certainly in tremendous fear and pain as he struggled against his attacker and thereafter saw the blood pouring onto his bed and then onto his body and floor in the bathroom. I find that this aggravator has been proven beyond a reasonable doubt and have given it substantial weight.
Duest asserts that Dr. Wright's testimony that Pope remained conscious for at least *46 fifteen minutes after the attack, and could have survived his wounds had he sought treatment, rendered the evidence insufficient to prove intent to kill. Therefore, according to Duest, the killing could not have been especially heinous, atrocious, or cruel. The State responds that HAC focuses on the circumstances surrounding the death, rather than the defendant's mental state. The State also maintains that Dr. Wright's testimony that Pope suffered twelve stab wounds, including blows to his temple and lungs, that some of the wounds were defensive, and that Pope was conscious for some minutes after the attack provides competent, substantial evidence supporting the finding of HAC.
This Court's role in considering challenges to findings on aggravating circumstances "is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Willacy v. State, 696 So.2d 693, 695 (Fla. 1997); see also Alston v. State, 723 So.2d 148, 160 (Fla.1998).
In several cases, this Court has affirmed findings of HAC as to murders committed by infliction of multiple stab wounds. In Guzman, we stated:
The HAC aggravator applies only in torturous murdersthose that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. Kearse v. State, 662 So.2d 677 (Fla.1995); Cheshire v. State, 568 So.2d 908 (Fla.1990). The crime must be conscienceless or pitiless and unnecessarily torturous to the victim. Richardson v. State, 604 So.2d 1107 (Fla.1992); Hartley v. State, 686 So.2d 1316 (Fla.1996). The HAC aggravating circumstance has been consistently upheld where the victim was repeatedly stabbed. See, e.g., Finney v. State, 660 So.2d 674 (Fla. 1995); Pittman v. State, 646 So.2d 167 (Fla.1994); Atwater v. State, 626 So.2d 1325 (Fla.1993).
721 So.2d at 1159. Guzman stabbed the victim numerous times with a samurai sword in the course of a robbery. See id. This Court upheld the trial court's finding of HAC, concluding that the wounds were "exemplified by an utter indifference to the suffering of another and the desire to inflict a high degree of pain. The victim was alive and conscious and experienced fear, terror, pain, and foreknowledge of death."Id. at 1160. In Brown, in which the victim suffered seventeen stab wounds, this Court upheld the HAC aggravator, concluding that the trial court reasonably found that the victim was conscious at the time of the attack and was aware of what was happening. See 721 So.2d at 278. See also Nibert v. State, 508 So.2d 1, 4 (Fla. 1987) (HAC upheld where victim was stabbed seventeen times, had several defensive wounds, and remained conscious during the attack).
In this case, Dr. Wright testified that Pope suffered twelve stab wounds, including blows to the back, temple, armpit, and upper right chest. Pope was stabbed in the lung and in the right side of the heart by a blow with a knife sturdy enough to penetrate his ribs. Wright characterized the wounds to Pope's arm and armpit as defensive, and testified that the penetration of the knife into Pope's body would have been painful. After infliction of the stab wounds, Pope remained alive and conscious for as long as fifteen to twenty minutes. The evidence showed that he aspirated blood from the stab wound to his lung. Pope remained on the bed for some minutes after he was stabbed, then walked into his bathroom, *47 where he collapsed and died.[11] The trial court found that Pope "was most certainly in tremendous fear and pain as he struggled against his attacker and thereafter stumbled into the bathroom, where ultimately, he died by drowning in his own blood."
As to Duest's claim of absence of an intent to kill, there is little or no basis to conclude that after inflicting the multiple wounds, Duest knowingly left Pope alive and with some prospect for survival. Moreover, unlike CCP, "the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death." Brown, 721 So.2d at 277. Also, HAC connotes an utter indifference to the victim's suffering, see Guzman, 721 So.2d at 1159, which we find supported by the record.
Duest also asserts that the trial court erred in finding HAC because the evidence suggests that Pope did not seek medical care because he did not consider his wounds life-threatening, rather than because he did not want his homosexual lifestyle discovered, as Dr. Wright speculated. However, the number and severity of the wounds belie the view that the victim, while he remained conscious, would not have appreciated the gravity of his condition. Moreover, regardless of speculation as to why Pope did not call for medical help, the evidence of prolonged suffering is sufficient to support the HAC finding. Accordingly, we conclude that the trial court's finding that the killing was especially heinous, atrocious, or cruel is supported by competent, substantial evidence.

PROPORTIONALITY
The purpose of our proportionality review in death cases is "to consider the totality of the circumstances in a case, and to compare it with other capital cases." Terry v. State, 668 So.2d 954, 965 (Fla. 1996). In engaging in proportionality review, this Court accepts the jury's recommendation and the trial judge's weighing of the aggravating and mitigating evidence. See Bates v. State, 750 So.2d 6, 12 (Fla.1999).
The trial court found the aggravators of (1) a prior violent felony for an armed robbery committed when Duest was nineteen years old and an armed escape in 1987 while awaiting trial in this case, (2) commission of the capital felony during a robbery or for pecuniary gain, and (3) HAC. The court found no statutory mitigating circumstances, and found twelve nonstatutory mitigating circumstances, giving two great weight, five some weight, three little weight and two very little weight.
This case is comparable to other cases in which the death penalty has been upheld based upon a similar weighing of aggravating and mitigating circumstances. In Morrison v. State, 818 So.2d 432 (Fla. 2002), this Court affirmed a death sentence for a murder by stabbing during a robbery. The trial court found four aggravators: that the defendant had previously been convicted of a violent felony, that the capital crime was committed during an armed robbery or burglary with an assault, *48 that the killing was especially heinous, atrocious, or cruel, and that the victim was particularly vulnerable due to age. See id. at 457. The court found no statutory mitigating circumstances, but gave great weight to Morrison's low intellectual ability combined with drug and alcohol abuse, and "some weight" to seven other mitigators. See id. We rejected an argument that death was disproportionate because Morrison did not enter the dwelling with the premeditated design to kill the victim and the killing resulted from a robbery gone awry. As noted in Morrison, see id., this Court rejected a similar argument and affirmed a death sentence based on the aggravators of prior violent felony conviction and a murder committed during a robbery in Mendoza v. State, 700 So.2d 670 (Fla.1997). In Carter v. State, 576 So.2d 1291, 1293 (Fla.1989), this Court rejected the defendant's proportionality argument based on a "robbery gone bad" where the trial court found three aggravating circumstances which far outweighed the nonstatutory mitigation.
In comparison to Morrison, Mendoza, and Carter, the evidence of an intentional killing is stronger in this case. Duest not only discussed a plan to pick up a gay man and rob him at the man's residence, but also obtained a knife from the apartment where he was staying while in Pope's company. The evidence indicates that Pope was initially stabbed in the back while he was naked and lying on his bed, and that the stereo was turned up to an unusually loud volume, possibly to mask the noise of a struggle. With aggravating circumstances comparable to Morrison, Mendoza, and Carter, and no statutory mitigation, the death penalty is proportionate in this case. As stated in Morrison, this Court has upheld death sentences in similar cases, even with statutory mitigation. See 818 So.2d at 457-58; see also, e.g., Bates v. State, 750 So.2d at 12 (holding death penalty proportionate in stabbing death where the court found three aggravators, including that the murder was committed during kidnaping and sexual battery, was committed for pecuniary gain, and HAC, versus two statutory mitigators and several nonstatutory mitigators and where testimony also indicated some neurological impairment of defendant); Spencer v. State, 691 So.2d 1062, 1066 (Fla.1996) (holding death penalty proportionate where the victim was beaten and stabbed and the court found two aggravators of prior violent felony and HAC versus two statutory mental mitigators plus drug and alcohol abuse and paranoid personality); Pope v. State, 679 So.2d 710, 716 (Fla.1996) (holding death penalty proportionate in stabbing death where two aggravating factors of commission for pecuniary gain and appellant's prior violent felony conviction outweighed two statutory mitigating circumstances of commission while under the influence of extreme mental or emotional disturbance and impaired capacity to appreciate the criminality of the conduct, as well as nonstatutory mitigating circumstances of intoxication and that defendant acted under the influence of mental or emotional disturbance).
In light of the three aggravating circumstances, each of which was found by the trial court to outweigh all of the mitigation, and the absence of both statutory mitigation and evidence indicating that the killing was the result of a "robbery gone awry," death is not an unconstitutionally disproportionate punishment in this case.

RING ISSUE
Duest next asserts that he was denied his right under the Sixth Amendment to the United States Constitution to trial by jury on all the elements of his offense, since there is no requirement under Florida *49 law of a jury trial to determine the existence of facts necessary to impose the death penalty. He bases his claim on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in which the United States Supreme Court held that if proof of a fact is necessary to subject a defendant to the death penalty, the Sixth Amendment requires that the fact be found by a jury beyond a reasonable doubt.
This Court, considering the effect of Ring, denied relief in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), which, like Duest's case, involved a prior-conviction aggravator. Ring rests on Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348. We have previously rejected claims under Apprendi and Ring in cases involving the aggravating factor of a previous conviction of a felony involving violence. See Lugo v. State, 845 So.2d 74, 119 n. 79 (Fla.2003) (noting rejection of Apprendi Ring claims in postconviction appeals, unanimous guilty verdict on other felonies, and "existence of prior violent felonies"); Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (stating that prior violent felony aggravator based on contemporaneous crimes charged by indictment and on which defendant was found guilty by unanimous jury "clearly satisfies the mandates of the United States and Florida Constitutions"). We likewise decline to grant relief under Ring here.

REMAINING CLAIMS
We reject the remaining issues raised by Duest as without merit. Specifically, we hold that the trial court did not err (1) in denying Duest's request that the prosecution be compelled to obtain and disclose criminal history information of State witnesses (issue 2), see Medina v. State, 466 So.2d 1046, 1049 (Fla.1985); State v. Crawford, 257 So.2d 898, 901 (Fla. 1972); (2) in sustaining the State's objection to a question of defense expert witness Dr. Fleming as to whether she found any mitigating circumstances (issue 6), see Wickham v. State, 593 So.2d 191, 193 (Fla. 1991); (3) in allowing the State to elicit testimony from Dr. Fleming identifying Duest's prior offenses after the witness stated that she considered the convictions in formulating her opinions (issue 7), see Johnson v. State, 608 So.2d 4, 10-11 (Fla. 1992); § 90.705(1), Fla. Stat.; and (4) in giving the jury death recommendation great weight while also independently weighing the aggravating and mitigating circumstances (issue 8), see Whitfield v. State, 706 So.2d 1, 6 (Fla.1997).

CONCLUSION
Having carefully considered and rejected each of Duest's challenges to his sentence, we affirm the death sentence in this case.
It is so ordered.
PARIENTE, LEWIS, QUINCE and CANTERO, JJ., and SHAW, Senior Justice, concur.
WELLS, J., concurs with an opinion, in which CANTERO, J., concurs.
PARIENTE, J., concurs specially with an opinion.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
*50 WELLS, J., concurring.
I concur in the decision in this case and join in the opinion. I write to point out that my reasons for rejecting the claim under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), are as I stated in my concurring opinion in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002). I believe the existence of a previous felony involving the violence aggravator is only an added basis upon which to reject that claim.
Florida's statute has been repeatedly evaluated and upheld by the United States Supreme Court as to its constitutionality under the United States Constitution. As I pointed out in Bottoson and King, this Court and our trial courts must continue to rely on those United States Supreme Court decisions which directly rule upon Florida's statute. Our courts cannot and should not rule on the basis of other courts' analyses of other states' statutes, including Arizona's.
This Court recognized in Mills v. Moore, 786 So.2d 532, 537 (Fla.2001), that the Supreme Court has directed lower courts that if a precedent of the Supreme Court has direct application in a case, lower courts are to follow the case which directly controls. Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).
I specifically disagree with Chief Justice Anstead's statement in his concurring opinion that "we, like the Arizona Supreme Court, are honor bound to apply Ring's interpretation of the requirements of the Sixth Amendment to Florida's death scheme." What we are directed to follow are Lambrix v. Singletary, 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997); Hildwin v. Florida, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989); Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); and Proffitt v. Florida, 428 U.S. 242, 251-60, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
CANTERO, J., concurs.
PARIENTE, J., specially concurring.
As in other cases presenting this issue, I write separately to explain my view that because one of the aggravating circumstances found by the trial court in this case was the previous conviction of a violent felony, Duest is not entitled to relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). See Anderson v. State, 841 So.2d 390, 409 (Fla. 2003) (Pariente, J., concurring as to conviction and concurring in result only as to sentence); Israel v. State, 837 So.2d 381, 394 (Fla.2002) (Pariente, J., concurring in result only), cert. denied, ___ U.S. ___, 123 S.Ct. 2582, 156 L.Ed.2d 611, 2003 WL 1948880 (U.S. June 16, 2003) (No. 02-10141); Bottoson v. Moore, 833 So.2d 693, 722-23 (Fla.2002) (Pariente, J., concurring in result only). I consider the prior-conviction aggravator the sole basis for our rejection of the Ring claim in this case, rather than an additional basis as Justice Wells states in his concurring opinion.
I also write to discuss the very legitimate concerns regarding reliance on the prior-conviction exception raised in the partially dissenting opinion in this case. Although I consider Chief Justice Anstead's view that the Sixth Amendment is not satisfied simply because a prior conviction aggravating circumstance need not be found by the jury to be a plausible extension of Ring, I have concluded that a strict reading of Ring does not require jury findings on all the considerations bearing on the trial judge's decision to impose death under section 921.141, Florida Statutes *51 (2002). In my concurring-in-result-only opinion in King v. Moore, 831 So.2d 143 (Fla.2002), I pointed to the United States Supreme Court's statement in Proffitt v. Florida, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), that it has "never suggested that jury sentencing is required" and to the echo of that statement in Ring:
To the extent that Proffitt holds that jury sentencing is not constitutionally mandated, Proffitt remains good law in light of Ring. Indeed, Ring does not hold that either the Sixth or the Eighth Amendment requires jury sentencing. See 536 U.S. at [612], 122 S.Ct. at 2445 (Scalia, J., concurring) ("[T]oday's judgment has nothing to do with jury sentencing. What today's decision says is that the jury must find the existence of the fact that an aggravating factor existed.").
831 So.2d at 151. I continue to believe that the strict holding of Ring is satisfied where the trial judge has found an aggravating circumstance that rests solely on the fact of a prior conviction, rendering the defendant eligible for the death penalty.[12]
I recognize that courts in other states have reached differing conclusions as to whether Ring requires more than a jury finding of a single death-qualifying aggravating circumstance. Compare Johnson v. State, 59 P.3d 450, 460 (Nev.2002) (concluding that under Ring, the finding that mitigating circumstances do not outweigh aggravating circumstances is a factual determination that must be made by the jury), with Brice v. State, 815 A.2d 314, 322 (Del.2003) (holding that the determination that aggravators outweigh mitigators is not a factual finding that must be made by the jury under Ring). The decisions in those cases, as well as Chief Justice Anstead's partially dissenting opinion in this case, illustrate that Ring has raised at least as many questions in the state courts as it has answered. However, unless and until the United States Supreme Court expands its holding in Ring, the death eligibility determination by a jury is the sole Sixth Amendment requirement I glean from Ring.
I do agree with Chief Justice Anstead that the exception recognized in Apprendi to the requirement of a jury finding is limited to "the bare fact of a prior conviction." In other words, where an aggravating circumstance requires a finding of a prior conviction plus another fact or facts, it is not exempt from Ring's extension of Apprendi to capital sentencing. In this case, the prior-conviction exception applies because one of the two offenses relied upon by the trial court for the prior violent felony conviction aggravator is a 1971 Massachusetts conviction of armed robbery, the existence of which was established by introduction of a certified copy of the conviction below.[13] Armed robbery is a felony that inherently "involv[es] the use or threat of violence to the person" under section 921.141(5)(b). Therefore, I conclude that the "bare fact" of Duest's robbery conviction, relied upon to support the prior conviction aggravator, made him eligible *52 for the death penalty under Apprendi and Ring.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority opinion except for its analysis and discussion of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In effect, the Court's decision adopts a per se harmlessness rule as to Apprendi and Ring claims in cases that involve the existence of the prior violent felony aggravating circumstance, even though the trial court expressly found and relied upon other significant aggravating circumstances not found by a jury in imposing the death penalty.[14] I believe this decision violates the core principle of Ring that aggravating circumstances actually relied upon to impose a death sentence may not be determined by a judge alone.
I find it compelling, for example, that the Arizona Supreme Court, the court whose opinion was reviewed in Ring, has now explicitly rejected the adoption of the same "harmlessness" rule that the majority embraces in the instant case. See State v. Ring, 204 Ariz. 534, 65 P.3d 915, 942-43 (2003). Upon remand of the Ring case to the Arizona Supreme Court, the State of Arizona argued that there are certain circumstances where the existence of an aggravating circumstance is (1) implicit in the jury's verdict, (2) not subject to Ring requirements because it was based on a prior conviction that could be found by a judge, or (3) otherwise established beyond a reasonable doubt. Id. at 942. Once the existence of one of these aggravating circumstances is established, the State posited, nothing in the Supreme Court's Ring decision would then prevent a trial judge from finding "the second and succeeding aggravating factors, as well as finding mitigating factors and balancing them against the aggravator." Id. Under these circumstances, the State asserted that the court could uphold a judge's imposition of the death sentence even if based upon the additional aggravators found by the judge alone, as harmless error. Id.[15] The Arizona Supreme Court expressly rejected this argument:
A narrow reading of Ring II[16] may permit a judge to decide the existence of additional aggravating factors in the circumstances described by the State. As the State contends, once the government establishes any aggravating factor, a defendant becomes "death eligible" in the strict sense, and establishing additional aggravating factors does not render a defendant "more" death eligible. In our view, however, Ring II should not be read that narrowly. Although the Court there considered a death sentence based *53 upon the existence of a single aggravating factor, we conclude that Ring II requires a jury to consider all aggravating factors urged by the state and not either exempt from Ring II, implicit in the jury's verdict, or otherwise established beyond a reasonable doubt.
Another factor leads us to conclude that we should not adopt the State's argument. As is evident, the procedures urged by the State do not reflect any sentencing procedure ever adopted by our legislature. In both the superseded and current capital sentencing schemes,[17] the legislature assigned to the same fact-finder responsibility for considering both aggravating and mitigating factors, as well as for determining whether the mitigating factors, when compared with the aggravators, call for leniency. Neither a judge, under the superseded statutes, nor the jury, under the new statutes, can impose the death penalty unless that entity concludes that the mitigating factors are not sufficiently substantial to call for leniency. The process involved in determining whether mitigating factors prohibit imposing the death penalty plays an important part in Arizona's capital sentencing scheme. We will not speculate about how the State's proposal would impact this essential process. Clemons v. Mississippi, 494 U.S. 738, 754, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990) ("In some situations, a state appellate court may conclude that peculiarities in a case make appellate ... harmless error analysis extremely speculative or impossible."); see also Johnson v. Nevada, 59 P.3d 450 (Nev.2002) (as applied to Nevada law, Ring II requires jury to weigh mitigating and aggravating factors under Nevada's statute requiring the fact-finder to further find whether mitigating circumstances are sufficient to outweigh the aggravating circumstances).
We therefore hold that the presence of one or more aggravating factors either exempt from Ring II, inherent in the jury's guilty verdict, or otherwise established beyond a reasonable doubt does not, in itself, establish that a defendant's capital sentence resulted from harmless error.
Id. at 942-43 (citation and paragraph numbering omitted). Hence, the Arizona Supreme Court expressly considered and rejected the exact same proposition relied upon by the majority today in affirming a death sentence predicated substantially upon findings of fact made by the trial judge rather than the jury.[18]
*54 In short, like the Arizona Supreme Court, I do not believe the Sixth Amendment requirements announced in Ring and Apprendi allow a trial judge alone to find additional aggravating circumstances to be utilized in imposing a death penalty just because a prior violent felony aggravating circumstance need not be found by the jury. These additional circumstances would have to be made by the jury. In the instant case, the trial judge alone found two important aggravating circumstances in addition to the prior violent felony aggravator: that the murder was especially heinous, atrocious, or cruel (HAC) and that the murder was committed while the defendant was engaged in the commission of a robbery.[19] An examination of the trial judge's finding of these aggravating circumstances illustrates the problems with the majority's rationale. Both aggravating circumstances were given "great weight" in the judge's ultimate sentencing decision. In contrast, the prior violent felony aggravating circumstance was given only "significant weight." Additionally, we have repeatedly stated that HAC is one of the most serious aggravating circumstances set out in Florida's sentencing scheme. See, e.g., Nelson v. State, 27 Fla. L. Weekly S797, 2002 WL 31190895 (Fla.2002); Card v. State, 803 So.2d 613, 623 (Fla. 2001), cert. denied, 536 U.S. 963, 122 S.Ct. 2673, 153 L.Ed.2d 845 (2002); Larkins v. State, 739 So.2d 90, 95 (Fla.1999).[20] By way of comparison, the "prior violent felony" aggravating circumstance in this case was based on two convictions, a conviction for armed robbery that occurred in 1971 and a 1987 conviction for escape with a weapon.[21] Clearly, the death sentence in this case was imposed because of the finding *55 by the trial court alone of two aggravating circumstances given great weight in the sentencing analysis. This violates the letter and spirit of Ring.
The Arizona court's analysis is equally applicable to Florida's death penalty scheme on this issue.[22] Even if a judge, rather than a jury, may find the facts necessary to establish the prior violent felony aggravating circumstance, there will rarely, if ever, be a case in Florida where the death penalty will be imposed solely on the existence of this aggravating circumstance. *56 [23] And, of course, this case is clearly not one of those rare cases. The death sentence here is predicated upon substantial additional findings of aggravation made solely by the trial court and not by the jury. Ring, of course, essentially stands for the proposition that any fact utilized by the trial court to impose the death penalty must be found by a jury and not the judge, much in the way that an element of the crime must be found by a jury. The logic implicit in the majority's position is that once the prior violent felony aggravating circumstance is present, a trial judge, rather than a jury, can then find additional aggravating circumstances that under Ring would ordinarily need to be found beyond a reasonable doubt by the jury, and the same trial judge may then utilize those additional circumstances to justify a death sentence. Clearly, as held by the Arizona Supreme Court, this "end run" around Ring would be improper and make a mockery of the principle Ring stands for.
In other words, the majority's position is that the mere existence of the prior violent felony aggravating circumstance allows the Court to ignore any error in the jury's failure to find the two aggravating circumstances that are not exempt from a Ring analysis and that were expressly found and actually relied upon by the trial court in imposing a sentence of death. However, to reach this conclusion, the Court must be prepared to say that this Sixth Amendment error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). In good conscience, I cannot declare this error harmless beyond a reasonable doubt. The finding of these additional aggravating circumstances was obviously integral to the trial judge's imposition of the death penalty, and violative of Ring's essential holding that the ultimate penalty, death, cannot be predicated upon findings of fact made by a judge rather than the jury.
Moreover, there is no support for adopting the procedure proposed by the majority within Florida's statutes as they are currently written. Notwithstanding the jury's participation in the form of an advisory sentence, Florida's system specifies that before the death penalty may legally be imposed, the trial judge is required to find "[t]hat sufficient aggravating circumstances exist" and "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." § 921.141(3)(a)-(b), Fla. Stat. (2002). This factual finding of each of the aggravating circumstances coupled with the determination that there are insufficient mitigating circumstances to outweigh the aggravating circumstances is an integral part of Florida's capital sentencing scheme. The majority's decision adopting a per se harmlessness rule where a prior violent felony exists short-circuits a process that we have consistently held essential. See, e.g., Porter v. State, 723 So.2d 191, 196 (Fla.1998) ("As we have repeatedly stressed, a trial judge's weighing of statutory aggravating factors and statutory and nonstatutory mitigating circumstances is the essential ingredient in the constitutionality of our death penalty statute.").[24]
*57 I agree that the U.S. Supreme Court has never addressed the precise question of whether Florida's death sentencing scheme would survive a Sixth Amendment challenge of the type that the defendant brought in Ring. However, the Court in Ring did specifically declare:
The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both.
Ring, 536 U.S. at 609, 122 S.Ct. 2428. Unfortunately, while we do not yet know the answer to whether Florida's sentencing scheme will ultimately survive a Sixth Amendment Ring challenge before the U.S. Supreme Court, with the majority's opinion today we now know that for a defendant in Florida "the factfinding necessary to put him to death" may still be done by a judge alone despite Ring's holding to the contrary.
I continue to view Ring as the most significant death penalty decision from the U.S. Supreme Court in the past thirty years and believe we, like the Arizona Supreme Court, are honor bound to apply Ring's interpretation of the requirements of the Sixth Amendment to Florida's death penalty scheme. See Bottoson v. Moore, 833 So.2d 693, 703 (Fla.2002) (Anstead, C.J., concurring in result only).[25]
NOTES
[1] The remaining two aggravators supporting imposition of death in Duest's first sentencing proceedings were previous conviction of a violent felony and murder committed in the course of a robbery or for pecuniary gain. See Duest, 462 So.2d at 449.
[2] The Eleventh Circuit originally vacated the death sentence, based on the reversal of the Massachusetts conviction, in Duest v. Singletary, 967 F.2d 472, 483 (11th Cir.1992). The United States Supreme Court vacated the judgment and remanded for reconsideration under the harmless error standard of Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), rather than the more stringent standard of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See Singletary v. Duest, 507 U.S. 1048, 113 S.Ct. 1940, 123 L.Ed.2d 647 (1993). On remand, the Eleventh Circuit held that reliance on the subsequently vacated conviction for the prior violent felony aggravator constituted harmful error under Brecht. See Duest, 997 F.2d at 1339-40.
[3] The trial court found the following: (1) physically and emotionally abusive childhood (great weight), (2) childhood traumatization and deprivation of love (great weight), (3) history of drug and alcohol abuse (some weight), (4) defendant was under influence of drugs or alcohol at time of crime (some weight), (5) institutional abuse and corruption in the Massachusetts prison system, which Duest entered at age 17 (some weight), (6) influence by peer group, particularly a cousin, to commit crimes (some weight), (7) defendant's diagnosis with lymphoma (some weight), (8) mutual care and love with friends and family (little weight), (9) willingness and ability to rehabilitate (little weight), (10) artistic ability (little weight), (11) lack of intent to kill victim, who was alive when defendant left residence and could have called for help (very little weight), (12) defendant treated unfavorably by others and had troubled childhood (very little weight).
[4] (1) The testimony of the medical examiner in the resentencing constitutes undisclosed evidence which calls into doubt the reliability of the verdict at trial; (2) the denial of a defense motion to have the State disclose criminal records of out-of-state witnesses deprived him of due process; (3) the trial court's exclusion of evidence regarding Duest's alibi deprived him of his rights to confrontation and to present a defense; (4) the trial court erroneously excluded evidence and denied an instruction on residual doubt of guilt; (5) the trial court erroneously instructed the jury on the cold, calculated and premeditated aggravator and erroneously denied instructions on two mental mitigating circumstances; (6) the trial court erroneously precluded a defense mental health expert from testifying that mental mitigating factors were present; (7) the trial court erred in permitting the State to elicit testimony identifying Duest's prior convictions from the defense mental health expert; (8) the trial court erred in giving the jury recommendation great weight; (9) the trial court erroneously found that the killing was especially heinous, atrocious, or cruel, and erroneously refused to find two mental health mitigators; (10) the death sentence is unconstitutionally disproportionate; and (11) the death sentence violates the Sixth Amendment right to a trial by jury.
[5] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[6] This Court denied Duest's motion to relinquish jurisdiction during this appeal in which he sought leave to pursue his Brady claim in the trial court.
[7] "The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance." § 921.141(6)(b), Fla. Stat. (2002).
[8] "The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired." § 921.141(6)(f), Fla. Stat. (2002).
[9] The standard jury instructions provide:

Among the mitigating circumstances you may consider, if established by the evidence, are:
....
2. The crime for which the defendant is to be sentenced was committed while [he] [she] was under the influence of extreme mental or emotional disturbance;
....
6. The capacity of the defendant to appreciate the criminality of [his] [her] conduct or to conform [his][her] conduct to the requirements of law was substantially impaired....
Fla. Std. Jury Instr. (Crim.) 7.11.
[10] § 921.141(6)(c), Fla. Stat. (2002).
[11] Because of Dr. Wright's revised conclusions, this evidence differs in several respects from the evidence on which this Court affirmed the HAC finding in Duest's direct appeal from his judgment and sentence: "The evidence presented at trial shows that the victim received eleven stab wounds, some of which were inflicted in the bedroom and some inflicted in the bathroom. The medical examiner's testimony revealed that the victim lived some few minutes before dying." Duest, 462 So.2d at 449.
[12] The Court characterized Ring's claim as "tightly delineated" in that it did not involve contentions concerning prior-conviction aggravators, jury findings on mitigating circumstances, or whether the jury must make the ultimate determination whether to impose the death penalty. See Ring, 536 U.S. at 597 n. 4, 122 S.Ct. 2428.
[13] The second conviction relied upon for this aggravator, a 1987 escape conviction, would not qualify under the "prior conviction" exception because the trial court went beyond the "bare fact" of the conviction and relied upon witness testimony to establish that the offense involved violence or the threat of violence to another person.
[14] I would agree Apprendi and Ring do not require a jury to find the existence of the bare fact of a prior conviction that increases a defendant's sentence. See Ring, 536 U.S. at 597 n. 4, 122 S.Ct. 2428 (noting that Ring did not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the prior conviction may be found by the judge even if it increases the statutory maximum sentence); Apprendi, 530 U.S. at 490, 120 S.Ct. 2348 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"). The question, however, under Ring, is whether a trial court may rely on aggravating circumstances not found by a jury in actually imposing a death sentence.
[15] This assertion relied on the fact that Arizona's death sentencing scheme rendered a defendant eligible for death if a single aggravating circumstance existed. Id.
[16] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[17] Following the U.S. Supreme Court decision in Ring, the Arizona legislature enacted a new death sentencing scheme requiring the jury to undertake the factual findings previously reserved for the judge. Compare Ariz. Rev.Stat. § 13-703.F (Supp.2001) with Ariz. Rev. Stat § 13-703.E (Supp.2002).
[18] Arizona is not the only state that has reached the conclusion that the Sixth Amendment protections announced in Ring are more than mere technicalities. In applying Ring to the Nevada capital sentencing scheme, the Nevada Supreme Court has also rejected the view that Ring violations are rendered harmless as long as there is an aggravating circumstance inherent in the jury's guilt phase verdict. See Johnson v. State, 59 P.3d 450, 460-61 (Nev.2002). In addition to jury findings with regard to aggravating circumstances, the supreme court concluded that Ring required the jury make the factual finding that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances:

Even if the guilty verdicts necessarily entailed the jury's finding of the two aggravators found by the three-judge panel, the guilt-phase verdicts did not and could not entail the required consideration of mitigating evidence. That evidence and that consideration were not presented to the jury until the penalty phase. And the facts from the first penalty hearing do not establish harmless error either. The accuracy of the penalty-phase special verdict forms was not verified when the jury was dismissed, but the forms indicate that the jurors found the two aggravating circumstances found by the panel and a number of mitigating circumstances. But even assuming arguendo that we could rely on these forms as proof of the jurors' findings, there is no verdict form or other evidence showing that the jurors unanimously agreed that the mitigating circumstances did not outweigh the aggravating circumstances, making Johnson eligible for death. We do know that at least one juror in this case did not agree that death was the proper sentence. Therefore, we cannot declare that the constitutional error that occurred was harmless beyond a reasonable doubt.
Id.
[19] The trial court also found that the evidence established that the crime was committed for pecuniary gain as an aggravating circumstance. The trial judge considered the pecuniary gain and committed in the course of a robbery aggravating circumstances as a single aggravating circumstance.
[20] Moreover, this is not even a situation where we could view the aggravating circumstance that the murder occurred in the course of a robbery as somehow "inherent" in the jury's guilt phase verdict. Duest was not charged separately with robbery, and the general verdict on first-degree murder did not indicate whether the jury found Duest guilty of premeditated or felony murder. Thus, the factfinding conducted by the judge in this case required not only that the murder took place during the course of a robbery, but that each of the elements of the underlying robbery were also satisfied.
[21] I find additional support against adopting the majority's rule in the Arizona Supreme Court's recognition that finding a prior violent felony conviction as an aggravating circumstance also requires the judge to "go beyond the mere fact that the prior conviction existed." State v. Ring, 65 P.3d at 939. The court noted that prior to 1993, Arizona's death penalty scheme

permitted finding this aggravating circumstance when "[t]he defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person." A.R.S. § 13-703.F.2 (1989) (emphasis added). State law did not define "violence" in this context. In United States v. Breitweiser, the court pointed out:
If a recidivist statute permitted enhancement based on proof of underlying conduct, however, factual questions could arise as to exactly what conduct the defendant engaged in. Typically, such factual questions are within the province of a jury and this Court doubts that the Supreme Court would construe Almendarez-Torres as applying to such situations.
220 F.Supp.2d 1374, 1379 (N.D.Ga.2002). We agree that when an additional finding must be made beyond the bare fact that a prior conviction exists, the Sixth Amendment demands that a jury perform this task.
Id.
Likewise, Florida's sentencing scheme requires additional findings beyond the bare fact of a prior conviction before it can be used as an aggravating circumstance. Section 921.141(5)(b), Florida Statutes (2002) permits the finding of an aggravating circumstance where "[t]he defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." Hence, other than a conviction of a capital felony, the trial judge must find that a felony conviction involved the use or threat of violence before this aggravating circumstance is proven. Indeed, our case law suggests that this aggravating circumstance often rests on factual determinations well beyond the mere existence of a prior conviction. See, e.g., Hess v. State, 794 So.2d 1249, 1264 (Fla.2001) (finding lewd assault on a child was not a per se crime of violence and "[t]hus, the state had the burden of proving that this crime involved violence or the threat of violence under the actual circumstances in which it was committed"); Sweet v. State, 624 So.2d 1138, 1143 (Fla.1993) (stating although possession of a firearm by a convicted felon is not "per se a crime of violence, the circumstances of this particular crime were shown to have been violent, as Sweet used the firearm to hit someone in the face and ribs"); Gore v. State, 706 So.2d 1328, 1333 (Fla.1998) (finding facts surrounding defendant's armed trespass of a conveyance qualified as a prior violent felony where testimony established he was "crouching behind the front seat of a woman's car with a loaded gun and a police scanner"); Brown v. State, 473 So.2d 1260, 1266 (Fla.1985) (finding facts contained in a presentence investigation for conviction of arson of an unoccupied building supported finding the prior violent felony aggravating circumstance); Johnson v. State, 465 So.2d 499, 505 (Fla.1985) ("[W]hether a previous conviction of burglary constitutes a felony involving violence... depends on the facts of the previous crime. Those facts may be established by documentary evidence, including the charging or conviction documents, or by testimony, or by a combination of both.").
[22] Although Arizona's capital sentencing scheme, which was struck down in Ring, was different than Florida's, the Arizona Supreme Court's reasoning is decidedly applicable. The Supreme Court in Ring categorized Florida's sentencing scheme as a "hybrid" system, because "the jury renders an advisory verdict but the judge makes the ultimate sentencing determinations." Ring, 536 U.S. at 608 n. 6, 122 S.Ct. 2428. It remains to be seen whether this distinction is meaningful in terms of what impact Ring might have on Florida's death penalty scheme. Nevertheless, the clearest statement from the Supreme Court would indicate that the Court views Florida's scheme as no different from Arizona's with regard to its reliance on judicial factfinding:

The distinctions Walton attempts to draw between the Florida and Arizona statutory schemes are not persuasive. It is true that in Florida the jury recommends a sentence, but it does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its recommendation is not binding on the trial judge. A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona.
Walton v. Arizona, 497 U.S. 639, 648, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).
[23] Indeed, no such case has been cited to the Court.
[24] In her separate opinion, Justice Pariente refers to my view that, under Ring, the Sixth Amendment prohibits the imposition of the death penalty based primarily on the trial judge's finding of aggravating circumstances as a "plausible extension" of Ring. This view is based simply upon a straightforward application of Ring without any extension of its holding requiring jury findings of aggravating circumstances used to impose a death sentence. Justice Pariente also notes that Ring does not require "jury sentencing." I agree that Ring does not require "jury sentencing." Briefly stated, under Ring, after a jury has found that specific aggravating circumstances exist, the judge is still free to make the ultimate decision of whether the death sentence should or should not be imposed based on these aggravating circumstances. However, where the jury has not found specific aggravating circumstances beyond a reasonable doubt, a judge may not undertake this factfinding required by the Sixth Amendment.

In sum, the view that the presence of a single "exempt" aggravating circumstance gives a trial judge free hand to find multiple "non-exempt" aggravating circumstances constitutes not only the most narrow reading of Ring possible, it is a reading that conflicts with Ring's central principle as well. Ring is, at its heart, based on the guarantee of the right to trial by jury provided in the Sixth Amendment of the United States Constitution. Ring, Apprendi, and these two opinions' predecessor, Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), stressed the essential nature and historical importance of the Sixth Amendment's right of trial by jury. These decisions each determined that the Sixth Amendment required a jury to find the existence of facts that increased a defendant's sentence beyond that allowed by a conviction alone. The Ring opinion was especially emphatic in rejecting form over substance in prohibiting a judge alone from making the factual findings actually utilized in sentencing a defendant to death. See Ring, 536 U.S. at 604, 122 S.Ct. 2428.
[25] The majority opinion also continues to repeat the erroneous proposition that there was a majority opinion in Bottoson and King when in fact there were only plurality opinions and a majority of justices (four), wrote separate opinions acknowledging that Ring impacted Florida's death penalty scheme in a variety of ways.