661 So.2d 1182 (1995)
David PANGBURN, Appellant,
v.
STATE of Florida, Appellee.
No. 81650.
Supreme Court of Florida.
July 6, 1995.
Rehearing Denied October 25, 1995.
*1184 Richard Bartmon Bartmon & Bartmon, Boca Raton, for appellant.
Robert A. Butterworth, Atty. Gen., and Sara D. Baggett, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
David Pangburn appeals his convictions and sentences for robbery and two counts of first-degree murder, including his sentence of death for one of the first-degree murder convictions. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm Pangburn's convictions and his sentence of life imprisonment for the robbery conviction, but we reverse his sentences for the two first-degree murder convictions and remand this cause for a new penalty phase proceeding.
At trial, the State presented evidence supporting the following account of the crimes. On November 20, 1989, the bodies of Diane Matlawski and Nancy Cole were discovered by law enforcement officers off Alligator Alley. Diane had suffered a number of lacerations and fractures to her head and a ligature mark was found around her neck. The fractures had been inflicted with an object similar to a baseball bat. She had died of asphyxiation, most likely caused by strangulation. Her ruby and diamond bracelets and her red Trans Am automobile were missing. Nancy had a number of injuries to her face, defensive wounds on her arm and hand, and a ligature mark around her neck. She too had died of asphyxiation. The time of death of both victims was estimated to be late in the evening on November 19, 1989, or early in the morning on November 20, 1989. A week after the bodies were found, officers found Diane's Trans Am parked at an apartment complex. Several witnesses reported seeing someone around the car the preceding week, but were unable to provide any information regarding the person's identity.
Officers had no investigative leads as to who committed the murders until July 9, 1990, when an informant called implicating the appellant and his brother Michael Pangburn. After the call, officers put together a photographic composite from which witnesses identified appellant and his brother Michael as being the individuals they saw in or around Diane's Trans Am the week following the murder. Additionally, a fingerprint found on a plastic bag inside Diane's car matched one of Michael's fingerprints. It was also discovered that the day after the murders, Michael was treated at an area hospital for an injury to his hand, at which time a witness saw him wearing two bracelets similar to those belonging to Diane; later that day appellant was visiting Michael at the hospital and was seen wearing one of the bracelets.
After appellant and Michael were implicated, officers attempted to locate them. Michael was apprehended as he was attempting to leave town. After being told that his fingerprint had been found in Diane's car, he gave two statements. In the first, he placed the blame for the murders entirely on appellant. In the second, he stated that he had arrived home to find Diane dead and that he assisted appellant in murdering Nancy only after being coerced into doing so by appellant.
Appellant was then located (he was in jail on an escape charge) and questioned about the murders. Officers told him that Michael had implicated him in murders, to which he replied: "I knew what we were doing was wrong... . [I]t was [Michael's] idea to kill the girls for the car... . If I tell you guys everything, I know I will be putting myself and my brother in the electric chair for sure."
Further investigation revealed that, at the time of the murders, the appellant, the appellant's brother Michael, and another male had been living in a house owned by Michael's male lover. A search of the house revealed bloodstains on the walls of several rooms, including appellant's bedroom. Fibers found in Diane's car and on Nancy's body matched carpet fibers from the house. Additionally, on the night of the murders, the other male living in the house heard arguing and loud noises and saw appellant carrying a baseball bat. Appellant told the roommate to go back to his room because what was going on was none of his business. The next day the roommate saw appellant and Michael removing *1185 some of the carpet in appellant's bedroom. Further, shortly after the murders, appellant was washing his laundry at the apartment complex where the Trans Am was found and, while there, told a witness that he had a new red sports car.
The theory of the defense was that Michael, not appellant, committed the murders. Although appellant did not testify at the conviction proceeding, Michael testified that he committed both murders while appellant was at work.[1] Several other witnesses testified to show inconsistencies in Michael's initial statements to the contrary and to show that the appellant had occasional access to a friend's car that resembled Diane's red Trans Am.
The jury found appellant guilty of the first-degree murder of Diane, the first-degree murder of Nancy, and robbery. A penalty phase proceeding was conducted and the jury returned a recommendation for the death penalty by a seven-to-five vote.
Subsequent to the penalty phase proceeding, the trial judge discovered that the jury had not been given separate jury forms to enable it to make separate recommendations as to each of the murders. Consequently, it was impossible to determine whether the seven-to-five vote for death applied to the murder of Diane, to the murder of Nancy, or to both. After much discussion among the judge, the attorneys, and appellant, the parties stipulated that the jury's recommendation would be accepted as one of death for Diane's murder and one of life imprisonment for Nancy's murder. Before appellant was sentenced, however, he attempted to withdraw his consent to the stipulation, but the trial judge refused to allow him to do so. The judge then sentenced appellant to death for the murder of Diane, finding the following factors in aggravation: (1) committed by a person under sentence of imprisonment (appellant committed the murder after escaping from prison); (2) prior violent felony (prior conviction for robbery); (3) committed during the course of a robbery (appellant was convicted of robbing the victim); and (4) the murder was heinous, atrocious, or cruel. He found no statutory mitigating factors, but he found the following nonstatutory mitigating factors: (1) appellant is a good parent, good husband, and family man (some weight); (2) appellant had done good deeds for other people (little weight); (3) appellant was mentally, physically, and emotionally abused as a child (great weight); (4) good employment record and belief in hard work and responsibility (little weight); (5) no positive male figure in his life (some weight); (6) had an abusive stepfather (some weight); (7) excellent behavior at trial (little weight); (8) mother had a problem with drugs, alcohol, and crime during appellant's youth (some weight); (9) potential for rehabilitation (some weight); and (10) father of a five-year-old who needs him (some weight). The trial judge rejected appellant's age of thirty years as a statutory mitigating circumstance. He also rejected the fact that Michael was sentenced to life in prison as a nonstatutory mitigating circumstance, finding that Michael was acquitted of the murder of Diane and received life for the murder of Nancy after it was determined that he merely assisted appellant in that murder.
The trial judge also sentenced appellant to life imprisonment with a minimum mandatory sentence of twenty-five years for the murder of Nancy, and to life imprisonment for the robbery conviction with a minimum mandatory sentence of fifteen years, with all sentences to run consecutively.
In this appeal, appellant raises five issues regarding the guilt phase[2] and twelve issues *1186 regarding the penalty phase.[3]

Guilt Phase
In his first conviction phase issue, appellant claims that the trial judge erred in denying his motion to suppress the incriminating statements he made to law enforcement officers. As previously indicated, when appellant was initially questioned by police, he stated: "I knew what we were doing was wrong... . [I]t was [Michael's] idea to kill the girls for the car... . If I tell you guys everything, I know I will be putting myself and my brother in the electric chair for sure." According to appellant, this statement was wrongfully elicited by the officers in violation of his Miranda[4] rights because he told officers he did not understand his rights before making the statement; he made the statement only after invoking his right to silence; and he made the statement only after the officers told him that Michael had implicated him in the murders. Additionally, appellant contends that the officers violated his right to counsel because, when he was questioned, he was in jail on a charge of escape and the officers did not check to see if he had invoked his right to counsel.
The record reflects that these claims are procedurally barred because they were not raised before the trial court. The only arguments raised by appellant at the hearing on the motion to suppress were that he was not read his Miranda rights and that he did not make the above statement. Both officers testified to the contrary and the trial judge denied the motion. Further, even if the arguments were not procedurally barred, we would find them to be without merit. The testimony of the officers reflects that a facility supervisor brought appellant to an office for the interview and told him he did not have to speak to the officers and could leave at any time. Appellant stated that he had "nothing to hide." The officers read appellant his rights and appellant stated that he understood his rights. The officers also asked appellant if he had previously requested any law enforcement officer to allow him to speak to an attorney, to which he responded in the negative. Thereafter, one of the officers told appellant that they were investigating the murders and that Michael had implicated him. Appellant sighed, lowered his head, and made the above statement. The officers then asked the appellant if would be willing to give a taped statement, to which appellant replied: "Listen, the man said I could go at any time and I am getting up and I am leaving." The total interview lasted approximately fifteen minutes. On these facts, we do not find that appellant's statement was wrongfully elicited or that the silence between the conclusion of the reading of his rights and the beginning of the interview constituted an invocation of his right to remain silent; nor do we find that appellant's right to counsel was violated.
In his next two claims, appellant argues that the evidence was not sufficient to support his convictions. First, appellant contends that no evidence was presented to show his intent to rob the victims or to show that the victims were aware of any taking of property at the time of the crime. By appellant's own admission, however, the victims were killed "for the car." Further, shortly after the murders appellant was seen with *1187 the victim's Trans Am and he told a witness that he had a new car. He was also seen wearing a bracelet similar to a bracelet stolen from one of the victims. There is no requirement for the victim to be aware that a robbery is being committed if force or violence was used to render the victim unaware of the taking. Jones v. State, 652 So.2d 346 (Fla. 1995). Consequently, we find that the evidence is sufficient to support the robbery conviction. We likewise reject appellant's contention that the murders were committed by Michael while he was in an angry and frenzied state rather than by appellant. Although Michael did testify that he alone committed the murders, the jury justifiably chose to reject that testimony, given that it contained numerous internal contradictions and was inconsistent with a number of Michael's prior statements that clearly indicated that appellant was the dominant force in these murders. Further, bloodstains were found in appellant's bedroom, a roommate saw appellant in the house carrying a baseball bat near the time of the murders, and appellant told the roommate to go back to his room because what was going on was none of his business. This evidence, when combined with appellant's own statements, is more than sufficient to support appellant's convictions for first-degree murder.
In addition to the sufficiency-of-the-evidence claim regarding the robbery conviction, appellant contends that the trial judge erred in imposing a minimum mandatory sentence for the robbery conviction to run consecutively to the two murder sentences. As the State concedes, this was reversible error under our decision in Hale v. State, 630 So.2d 521 (Fla. 1993) (minimum mandatory sentences resulting from enhancement under habitual offender statute and imposed for crimes arising out of same criminal episode may only be imposed concurrently, not consecutively), cert. denied, ___ U.S. ___, 115 S.Ct. 278, 130 L.Ed.2d 195 (1994). Although we affirm the minimum mandatory sentence of fifteen years on the robbery charge, we hold that the sentence must run concurrently rather than consecutively to the sentences imposed on the two first-degree murder convictions.
Next, appellant argues that the State impermissibly vouched for the credibility of law enforcement officers, misstated evidence, and commented, in closing arguments, on appellant's silence during interrogation. We find these claims to be procedurally barred because no objections were raised by counsel at the time the comments were made. Wasko v. State, 505 So.2d 1314 (Fla. 1987), limited on other grounds, Bogle v. State, 655 So.2d 1103 (Fla. 1995). Further, when taken in context, the comments of the State were not impermissible. Consequently, we find this claim to be without merit.
In his final guilt phase issue, appellant contends that the trial judge erred in admitting photographs of the victims. Appellant claims that these photographs showed gruesome features of the victims and that the shocking nature of the pictures outweighed any relevant value the pictures might have had at trial. Generally, the admission of photographic evidence is within the trial judge's discretion and a trial judge's ruling on this issue will not be disturbed on appeal unless there is a clear showing of abuse. Wilson v. State, 436 So.2d 908 (Fla. 1983). Nonetheless, we have previously determined that the admission of gruesome photographs may be improper when they are irrelevant or other photographs are adequate to support the State's contentions. See, e.g., Thompson v. State, 619 So.2d 261 (Fla.) (autopsy photographs were improperly introduced when they were not essential given that other photographs introduced were more than adequate to support the claim that the murder was heinous, atrocious, or cruel), cert. denied, ___ U.S. ___, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993); Czubak v. State, 570 So.2d 925 (Fla. 1990) (gruesome photographs improperly introduced when not relevant to any issue). Further, we have cautioned that trial judges should carefully scrutinize photographs for prejudicial effect, especially when less graphic photographs are available to illustrate the same point. Marshall v. State, 604 So.2d 799 (Fla. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2355, 124 L.Ed.2d 263 (1993). Applying these standards to the instant case, we find that the trial judge did not abuse his discretion in admitting the *1188 photographs. Two photographs were introduced to assist a law enforcement officer in documenting the scene where the victims were found. The trial judge specifically viewed the pictures after defense counsel objected to their introduction and determined that the pictures could be admitted. The remaining pictures were admitted only after the trial judge personally viewed them and after the medical examiner confirmed that the pictures were necessary to his testimony. Given the relevance of the photographs to this testimony, we cannot say that the trial judge abused his discretion in admitting them.

Penalty Phase
We now turn to the issues appellant raises regarding the penalty phase portion of his trial. Of the twelve issues he raises, we find the first to be dispositive. In that issue, appellant contends that the failure to properly instruct the jury on separate advisory verdicts and the failure to provide the jury with separate verdict forms for each victim constitute reversible error and require a new sentencing proceeding. As previously indicated, the jury in this case rendered a seven-to-five recommendation for death without providing any indication as to whether the recommendation was a seven-to-five vote on each murder or a seven-to-five vote for one of the murders and a recommendation of life for the other.
Section 921.141, Florida Statutes (1991), which governs the penalty phase proceeding in a capital case, provides that a jury is to render to the court an advisory sentence of either life imprisonment or death. § 921.141(2). The statute clearly addresses this advisory sentence as it pertains to a single murder. See § 921.141(1), (2) ("Upon conviction or adjudication of guilt of a defendant of a capital felony ... the jury shall ... render an advisory sentence.") (emphasis added). The exercise of a jury's discretion in rendering this advisory sentence cannot be unlimited, uncontrolled, or unguided. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Further, the jury's recommendation can be made only after a jury has been carefully instructed on and has carefully weighed the applicable aggravating and mitigating circumstances. See, e.g., Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). When juries are asked to provide recommendations in penalty phase proceedings involving multiple counts of first-degree murder, those juries frequently render different recommendations for different counts. See LeCroy v. State, 533 So.2d 750 (Fla. 1988) (two murders: one recommendation of death, one recommendation of life), cert. denied, 492 U.S. 925, 109 S.Ct. 3262, 106 L.Ed.2d 607 (1989); Craig v. State, 510 So.2d 857 (Fla. 1987) (same), cert. denied, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988); Miller v. State, 415 So.2d 1262 (Fla. 1982), cert. denied, 459 U.S. 1158, 103 S.Ct. 802, 74 L.Ed.2d 1005 (1983). This is because the aggravating and mitigating circumstances that apply to one count may not apply to another. Although the issue here is one of first impression for this Court, we find that, under Florida's scheme for imposing a sentence of death, a separate jury recommendation must be rendered for each count of first-degree murder being considered. To hold otherwise would undermine our sentencing procedure in capital cases by allowing arbitrary and irrational results. This is especially true given that a jury's recommendation is given great weight in the final sentence imposed on a defendant. Tedder v. State, 322 So.2d 908 (Fla. 1975).
In essentially conceding that the failure to provide the jury with separate verdict forms was error, the State nevertheless argues that a new penalty phase proceeding is not required in this case because of the stipulation between appellant and the State. As mentioned previously, the record reflects that, after the error in this case was discovered, the parties entered into a stipulation providing that the jury's recommendation would be accepted as one of death for Diane's murder and one of life imprisonment for Nancy's murder. By entering into this agreement, appellant effectively waived his right to a new penalty phase proceeding before a jury. Before appellant was sentenced by the trial judge, however, he moved to withdraw his consent to the stipulation. The trial judge rejected this request, finding that *1189 no legal basis had been presented to warrant granting the withdrawal. The State asserts that no new penalty phase proceeding is required because the trial judge correctly denied appellant's withdrawal request. Thus, the critical question in this case is whether the trial judge properly denied appellant's request to withdraw his consent to the stipulation and whether the stipulation can be enforced.
We have clearly determined that a defendant may waive the right to a jury trial in the sentencing phase of a capital crime provided the waiver is voluntarily, intelligently, and knowingly made. State v. Hernandez, 645 So.2d 432 (Fla. 1994); Palmes v. State, 397 So.2d 648 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981). The granting or denying of a request to withdraw a valid waiver of a jury trial is within the discretion of the trial court. Floyd v. State, 90 So.2d 105 (Fla. 1956); Cochran v. State, 383 So.2d 968 (Fla. 3d DCA 1980). Nevertheless, that discretion is to be exercised liberally in favor of granting a defendant's request to withdraw. Floyd; Cochran; Baker v. Wainwright, 245 So.2d 289 (Fla. 4th DCA 1971). This liberal standard would be particularly applicable to waivers involving penalty phase juries.
In this case, the trial judge rejected appellant's withdrawal request because he found "no legal basis ... that would warrant the right to withdraw." Although the trial judge is to be commended for attempting to resolve an obviously untenable situation, we find that he applied the wrong standard in determining whether to grant appellant's request. As we noted in Floyd:
It would appear to us that the fundamental and cherished right of trial by jury will best be protected and be caused to "remain inviolate" if the withdrawal of the waiver to such a trial is refused by a court only when it is not seasonably made in good faith, or is made to obtain a delay, or it appears that some real harm will be done to the public.
90 So.2d at 106. Applying that liberal standard to the facts of this case, we find that the trial judge should have granted appellant's request to withdraw. The record reflects that the withdrawal request was made before appellant was sentenced, that it was not made to obtain a delay, and that no substantial harm would have been done by the granting of this request. In fact, a new penalty phase proceeding was one of the options initially presented to appellant. Given that the right to a jury in the penalty phase proceeding is such a substantial right, we conclude that a new penalty phase proceeding is required under these circumstances.
Because we find that a new penalty phase proceeding is required, we need not reach the remaining issues raised by appellant. For purposes of providing guidance on remand, however, we do address one further issue. Before the original penalty phase proceeding in this case, appellant waived any reliance on the statutory mitigating factor of no significant history of prior criminal activity in order to prevent the State from referring to any of his prior non-violent criminal convictions. This waiver was in accordance with Maggard v. State, 399 So.2d 973 (Fla.) (when appellant waives statutory mitigation of no significant prior crimes, the State cannot present evidence of this record), cert. denied, 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 598 (1981). When appellant testified at the penalty phase proceeding, the trial judge allowed the State to ask appellant on cross-examination if he had ever been convicted of a felony. Appellant replied that he had nine prior felony convictions. According to appellant, this violated the dictates of Geralds v. State, 601 So.2d 1157 (Fla. 1992), which holds that the rule in Maggard cannot be violated under the guise of impeaching a witness.
In Maggard, we determined that the State is prohibited from presenting evidence of the defendant's criminal record when a defendant waives statutory mitigation of no significant prior crimes. In reaching this conclusion, we concluded that "mitigating circumstances are for the defendant's benefit, and the State should not be allowed to present damaging evidence against a defendant to rebut a mitigating circumstance that the *1190 defendant expressly concedes does not exist." 399 So.2d at 978.
We subsequently stated in Geralds that this rule cannot be violated under the guise of impeaching a witness. 601 So.2d at 1162-63. This does not mean that the State cannot impeach appellant, as the defendant in this case, by asking if he has ever been convicted of a felony. In Geralds, the defense put a witness on the stand to testify that the defendant was a good neighbor. On cross-examination, the State asked, under the guise of impeachment, whether the witness was aware of the defendant's prior criminal convictions. Through that and subsequent questions, the jury was made aware of the defendant's numerous prior criminal convictions. On appeal, we determined that the State was not entitled to present otherwise inadmissible information regarding a defendant's criminal history through witness impeachment. This rule, however, does not apply when a defendant takes the stand. We have previously determined that the State may attack the credibility of any witness, including the accused, by evidence of a prior felony conviction. Fotopoulos v. State, 608 So.2d 784 (Fla. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993). This is true even during the penalty phase portion of a capital case. Id. at 791. Placing a defendant on the stand to testify is always a tactical decision because the State can ask the defendant about prior felony convictions. In choosing whether to testify, a defendant must weigh the benefits and detriments of allowing this information to be supplied to the jury. Because of this choice, the policy reasons for prohibiting the introduction of prior criminal convictions under the Maggard rule do not apply when it is the defendant who is testifying. Consequently, on remand, if appellant chooses to testify, the State will not be prohibited from asking him whether he has ever been convicted of a felony and, if so, how many times. Fotopoulos, 608 So.2d at 784 (Fla. 1992).
Accordingly, we affirm David Pangburn's convictions for robbery and two counts of first-degree murder, but we reverse his sentences for the two first-degree murder convictions and remand this cause for a new penalty phase proceeding. We also affirm his sentence of life imprisonment for the robbery conviction but, pursuant to our decision in Hale, hold that the sentence is to run concurrently rather than consecutively to the sentences eventually imposed on the two first-degree murder convictions.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Michael was tried separately and acquitted of the murder of Diane but was found guilty of the first-degree murder of Nancy, for which he was sentenced to life in prison. His theory of defense was that he did not participate in the murder of Diane and that he merely assisted appellant in the murder of Nancy.
[2] As to the conviction proceeding, appellant contends that: (1) the trial judge erred in denying the motion to suppress appellant's initial statement to law enforcement officers; (2) the evidence is not sufficient to support the armed robbery charge; (3) the evidence is not sufficient to support the first-degree murder convictions; (4) the State impermissibly vouched for the credibility of officers, misstated evidence, and commented on appellant's silence during interrogation; and (5) the trial judge erred in admitting autopsy photographs of the victims.
[3] Regarding the penalty phase proceeding, appellant asserts that: (1) the sentencing proceeding was rendered unfair by the failure to properly instruct the jury on requiring separate advisory verdicts and to provide the jury with separate verdict forms for each of the victims; (2) the judge erred in permitting appellant's prior criminal record to be introduced at the penalty phase proceeding; (3) the aggravating circumstance of committed during commission of a robbery was not supported by the evidence; (4) the trial judge erred in denying appellant's requested jury instruction on felony-murder as an aggravating circumstance; (5) the aggravating circumstance of felony-murder is unconstitutional; (6) the murder was not heinous, atrocious, or cruel; (7) the trial judge erred in denying appellant's requested jury instruction on the heinous, atrocious, or cruel aggravating circumstance; (8) the jury instruction on the aggravating circumstance of heinous, atrocious, or cruel is unconstitutional; (9) the trial judge erred in admitting and considering prejudicial, irrelevant hearsay evidence as to the prior violent felony aggravating factor; (10) improper victim impact evidence was admitted at trial; (11) the death penalty is not proportionate in this case; and (12) the trial judge erred in concluding that the aggravating factors outweighed the mitigating factors.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).