875 So.2d 359 (2003)
Eddie Wayne DAVIS, Appellant,
v.
STATE of Florida, Appellee.
Eddie Wayne Davis, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC02-1580, SC02-2472.
Supreme Court of Florida.
November 20, 2003.
Rehearing Denied June 3, 2004.
*362 Bill Jennings, Capital Collateral Regional CounselMiddle Region, Richard E. Kiley, Assistant CCRC and James V. Viggiano, Jr., Assistant CCRC, Office of the Capital Collateral Regional CounselMiddle Region, Tampa, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Candance M. Sabella, Chief-Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Eddie Wayne Davis was sentenced to death for the murder of an eleven-year-old child following a unanimous jury recommendation. This Court affirmed the conviction and death sentence. See Davis v. State, 698 So.2d 1182 (Fla.1997). Now in postconviction proceedings, Davis appeals a trial court order denying postconviction relief following an evidentiary hearing and further petitions this Court for a writ of habeas corpus alleging ineffective assistance of appellate counsel.[1] His claim for postconviction relief is based primarily on claims of ineffective assistance of counsel in the guilt and penalty phases. Specifically, Davis asserts that trial counsel was ineffective in: (1) failing to present the defense of voluntary intoxication in the guilt phase; (2) failing to argue to the jury as to the inherent unreliability of Davis's confessions; (3) failing to obtain an on-the-record waiver of Davis's right to testify in the penalty phase; and (4) failing to present a "qualified" expert on sexual abuse as mitigation evidence in the penalty phase. For the reasons that follow, we affirm the denial of Davis's postconviction motion and deny the petition for habeas corpus.

FACTS AND PROCEDURAL HISTORY
Davis was convicted of murdering eleven-year-old Kimberly Waters, whose body *363 was found in a dumpster close to her home. See Davis, 698 So.2d at 1186-87. As we explained:
On March 5, police questioned Davis, a former boyfriend of Kimberly's mother, at the new residence where he and his girlfriend were moving. Davis denied having any knowledge of the incident and said that he had been drinking at a nearby bar on the night of the murder. Later that same day police again located Davis at a job site and brought him to the police station for further questioning, where he repeated his alibi. Davis also agreed to and did provide a blood sample.
While Davis was being questioned at the station, police obtained a pair of blood-stained boots from the trailer Davis and his girlfriend had just vacated. Subsequent DNA tests revealed that the blood on the boots was consistent with the victim's blood and that Davis's DNA matched scrapings taken from the victim's fingernails.
Id. at 1186. While in a holding cell, Davis gave one unrecorded confession and two recorded confessions to the police. In his final confession he stated that he originally went to the home of the victim's mother, Beverly Schultz, who was his girlfriend, to look for money to buy beer:
Because Schultz normally did not work on Thursday nights and because her car was gone, Davis believed that no one was home. Indeed, Schultz was not home at the time because she had agreed to work a double shift at the nursing rehabilitation center where she was employed. However, her daughters, Crystal and Kimberly, were at the house sleeping. When Davis turned on the lights in Beverly Schultz's bedroom, he saw Kimberly, who was sleeping in Schultz's bed. Kimberly woke up and saw him. He put his hand over her mouth and told her not to holler, telling her that he wanted to talk to her. Kimberly went with him into the living room. Davis put a rag in her mouth so she could not yell.
Davis related that they went outside and jumped a fence into the adjacent trailer park where Davis's old trailer was located. Davis said that while they were in the trailer, he tried to put his penis inside of Kimberly. When he did not succeed, he resorted to pushing two of his fingers into Kimberly's vagina. Afterwards, Davis took Kimberly to the nearby Moose Lodge. He struck her several times, then placed a piece of plastic over her mouth. She struggled and ripped the plastic with her fingers but Davis held it over her mouth and nose until she stopped moving. He put her in a dumpster and left.
... The jury found Davis guilty of first-degree murder, burglary with assault or battery, kidnapping a child under thirteen years of age, and sexual battery on a child under twelve years of age.
Id. at 1186-87. During the four-day penalty phase, Davis's trial counsel presented the testimony of fifteen witnesses in mitigation. These witnesses included Davis's father, stepmother, girlfriend, coworker and friend, maternal aunt, grandmother, paternal aunt, control release supervisor, and special group leader and youth counselor at HRS, as well as three mental health experts. Despite the extensive mitigating testimony, the jury unanimously recommended the death penalty. In imposing the death penalty, the trial court concluded in a detailed and comprehensive sentencing order that the aggravation outweighed the substantial mitigation. In aggravation, the trial court found that the murder was (1) committed by a person under sentence of imprisonment; (2) committed *364 during the commission of a kidnapping and sexual battery; (3) committed for the purpose of avoiding or preventing a lawful arrest; and (4) especially heinous, atrocious, or cruel. As statutory mitigation, the court found that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance and gave this factor great weight.[2]
On direct appeal, Davis raised ten issues.[3] The Court determined that Davis's untaped confession while in his holding cell should have been suppressed. See id. at 1189. However, the Court found this error harmless beyond a reasonable doubt because shortly after confessing in his holding cell, Davis gave a taped statement in which he was fully apprised of his Miranda[4] rights and voluntarily gave the same information contained in the untaped confession. See id. The Court rejected the other issues raised by Davis as without merit and affirmed Davis's conviction and death sentence. See id. at 1194.
Davis filed a motion for postconviction relief raising twelve claims.[5] After a Huff[6] *365 hearing, the trial court granted an evidentiary hearing on a portion of Davis's claims.[7] After the evidentiary hearing, the trial court denied relief in a comprehensive order. Davis now appeals the denial of his postconviction motion and also petitions this Court for a writ of habeas corpus.

I. INEFFECTIVE ASSISTANCE OF COUNSEL

A. Ineffective Assistance of CounselGuilt Phase
Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review. See Stephens v. State, 748 So.2d 1028, 1033 (Fla. 1999). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id. In order for a claim of ineffective assistance of counsel to be considered meritorious, a defendant must establish two components under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Stephens, 748 So.2d at 1033. First, a defendant must establish conduct on the part of counsel that is outside the broad range of competent performance under prevailing professional standards. See Kennedy v. State, 547 So.2d 912, 913 (Fla.1989). Second, the deficiency in counsel's performance must be shown to have so affected the fairness and reliability of the proceedings that confidence in the outcome is undermined. See id.; see also Rutherford v. State, 727 So.2d 216, 219 (Fla.1998) ("[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.") (quoting Strickland, 466 U.S. at 686, 104 S.Ct. 2052).

1. Voluntary Intoxication
Davis argues that his trial counsel was ineffective for "failing to present the defense *366 of voluntary intoxication as a valid defense to first-degree murder." Although it is uncontested that there was abundant evidence presented during the guilt phase of trial by both the State and the defense that Davis was intoxicated at the time of the offense, Davis specifically argues that his trial counsel failed to either present actual evidence in the form of an expert opinion, or request a jury instruction that Davis lacked the specific intent required for a finding of guilt on the charge of first-degree murder due to his voluntary intoxication, or both.
This Court has stated that "[c]ounsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions. Moreover, strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000) (citations omitted). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Rolling v. State, 825 So.2d 293, 298 (Fla.2002) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052).
At the evidentiary hearing, Davis presented the testimony of Dr. Michael Maher, an expert in forensic psychiatry, who testified that in his opinion Davis was sufficiently intoxicated at the time of the offense that his capacity to commit premeditated acts of murder was very substantially impaired. Austin Maslanik, Davis's lead counsel, testified that he did not request a specific instruction on voluntary intoxication for four specific reasons, including the fact that Davis gave two very detailed confessions of the crime which would tend to undermine an argument that Davis was seriously impaired. This view of the evidence is set forth in the trial judge's sentencing order:
The evidence was that the defendant had been drinking the afternoon before the murder.... The barmaid ... testified that the defendant did not appear to be intoxicated. [She] was the last objective person to see the defendant before the murder and her testimony, in the opinion of this Court, was believable. The Court, however, believes the defendant was somewhat intoxicated, but not to the point it affected his actions and knowledge.
The defendant left the bar and decided to burglarize the victim's home in hope of finding more beer money as he stated in both of the taped confessions. The defendant unscrewed the front porch light bulb so no one would see him enter. When the defendant turned on the light in the master bedroom he was surprised to find the victim. He stated in his second taped confession he could not turn the light off before the victim saw him. At this time the defendant's intent changed.... The defendant stated in his second taped confession that he placed his hand over the victim's mouth, told her to be quiet and led her out of the house, while stuffing a rag in her mouth. He then either took her directly to the curtilage of the Moose Club (taped confession # 1) or to his trailer (taped confession # 2) where he brutally and forcefully raped her. The defendant had the state of mind not to rape her in her house but to take her to another location. All of this is noted in both taped confessions which give exacting detail beyond one in an intoxicated blackout.... In fact the defendant described in detail how he forcefully penetrated *367 the victim's vagina with his two fingers. He also described how he beat her, held her down, placed plastic over her mouth and nose for a couple of minutes, while the victim ripped at the plastic and tried to get away.
The defendant then made a conscious, knowing, decision to take the lifeless body, boost it over the dumpster (taped confession # 1) and shut the lid (taped confession # 2)....
This Court allowed the defendant's attorney to argue this statutory mitigator to the Court, but the facts of this case, the defendant's statements and actions show there was no mental disturbance interfering or obviating the defendant's knowledge of right or wrong.
We conclude that this case is similar to Stewart v. State, 801 So.2d 59 (Fla.2001), where we rejected a claim that trial counsel was ineffective for not pursuing a voluntary intoxication defense. In so doing, we noted that during the evidentiary hearing Stewart's trial counsel testified that his conversations with the defendant persuaded him that an involuntary intoxication defense would not be appropriate due to Stewart's detailed account of the crime and the State's potential use of experts who examined Stewart to determine his competency to stand trial. See id. at 65. The Court concluded that the record of both the evidentiary hearing and trial demonstrated that trial counsel made an informed and reasoned decision not to pursue a voluntary intoxication defense for strategic reasons. See id. at 65. Similarly, in Occhicone, 768 So.2d at 1048, and Johnson v. State, 593 So.2d 206, 209 (Fla. 1992), the Court rejected claims that counsel was ineffective for not pursuing an intoxication defense where defendant had good recall of what transpired on the night of the murders and, therefore, was not intoxicated to the level of not being able to premeditate the murders.
Similar to the defendants in Stewart, Occhicone, and Johnson, in this case Davis gave two taped, detailed confessions as to the circumstances of the crime that substantially undermined the viability of a voluntary intoxication defense. The testimony of defense counsel and the record of the confession in this case provide competent, substantial evidence to support the trial court's findings that Maslanik made an informed and strategic decision not to pursue an intoxication defense. Thus, counsel was not deficient and Davis is not entitled to relief on this issue.
Moreover, even if counsel's performance was deficient, we note that there was a general verdict in this case and the evidence supported an instruction on felony murder based on sexual battery, which is a general intent crime to which voluntary intoxication is not a defense. Therefore, even if the jury had been instructed on voluntary intoxication as a defense to premeditated murder, because the general verdict did not differentiate between premeditated murder and felony murder, Davis cannot establish prejudice. See Sochor v. State, 619 So.2d 285, 290 (Fla.1993) (rejecting claim that trial court committed fundamental error by not instructing the jury on voluntary intoxication as a defense to felony murder based on kidnapping, based in part on the fact that there was sufficient evidence of sexual battery, a general intent crime to which voluntary intoxication is not a defense). Therefore, the trial court did not err in denying this claim.

2. Davis's Confessions
Davis next argues the trial court erred in not granting him an evidentiary hearing on his claim that trial counsel was ineffective "for failing to argue to the *368 jury as to the inherent unreliability of Davis's confessions." A postconviction defendant is entitled to an evidentiary hearing unless the motion and record conclusively show that the defendant is entitled to no relief. See Floyd v. State, 808 So.2d 175, 182 (Fla.2002). Although this Court has urged trial courts to err on the side of caution when deciding whether or not to grant an evidentiary hearing on postconviction claims, "[a] defendant may not simply file a motion for postconviction relief containing conclusory allegations that his or her trial counsel was ineffective and then expect to receive an evidentiary hearing." State v. Coney, 845 So.2d 120, 135 (Fla.2003); see also Kennedy, 547 So.2d at 913. In order for a motion to be facially sufficient, the defendant must allege specific legal and factual grounds that demonstrate a cognizable claim for relief.
This claim was properly denied by the trial court because Davis failed to plead this claim specifically. Davis does not allege in his motion what is inherently unreliable in the two detailed confessions, nor does he direct us to portions of the record where trial counsel failed to effectively cross-examine witnesses on the confessions' inconsistencies. Davis's conclusory allegations that the jury would have reached a different result had trial counsel argued the "inconsistent parts of the confessions" are not supported by a properly pled factual basis. Thus, this claim is facially insufficient and the trial court did not err in summarily denying this claim.

B. Ineffective Assistance of CounselPenalty Phase

1. On-the Record Waiver
In his first claim of penalty phase ineffectiveness, Davis argues that trial counsel was ineffective in failing to obtain an on-the-record waiver by Davis of his right to testify in the penalty phase of trial. In Torres-Arboledo v. State, 524 So.2d 403, 410 (Fla.1988), the Court addressed whether due process required that the trial court obtain from the defendant an on-the-record waiver of the right to testify in the guilt phase. The Court stated:
Although we agree that there is a constitutional right to testify under the due process clause of the United States Constitution,... this right does not fall within the category of fundamental rights which must be waived on the record by the defendant himself. We view this right to be more like an accused's right to represent himself. Although such a right has been expressly recognized by the United States Supreme Court ... this right has not been considered so fundamental as to require the same procedural safeguards employed to ensure that a waiver of the right to counsel is knowingly and intelligently made.
Id. at 410-11. In Torres-Arboledo, the Court relied in part on Cutter v. State, 460 So.2d 538 (Fla. 2d DCA 1984), where the Second District stated that the right to testify may be waived by the defendant's attorney "in the absence of express disapproval on the record by the defendant during the pretrial or trial proceedings." Cutter, 460 So.2d at 539; See Torres-Arboledo, 524 So.2d at 410 (expressly approving Cutter); see also Occhicone v. State, 570 So.2d 902, 905 (Fla.1990) (relying on Torres-Arboledo to hold that the trial court did not err in not telling Occhicone specifically that he had the right to testify on his own behalf). The standard adopted in Torres-Arboledo applies to the defendant's right to testify at both the guilt and penalty phase. See Lawrence v. State, 831 So.2d 121, 132 (Fla.2002).
In this case, the trial court obtained from Davis an on-the-record waiver *369 of his right to testify in the guilt phase, in which Davis affirmatively participated. In securing this waiver, the trial court inquired as to whether Davis wanted to testify and made Davis aware that whether or not to testify was his decision. In the penalty phase, defense counsel indicated that his client would not be testifying. Davis did not testify during the postconviction evidentiary hearing that he disagreed with counsel's waiver. Nor does Davis assert that he was otherwise prevented by counsel from testifying. In fact, his defense counsel stated that the subject of whether Davis would testify in the penalty phase was discussed with Davis. Therefore, because the record affirmatively shows that our holding in Torres-Arboledo was not violated, Davis's counsel was not ineffective in failing to obtain an on-the-record waiver by Davis of his right to testify in the penalty phase.
Moreover, Davis has not established prejudice under the second prong of Strickland. Because Davis did not testify at the evidentiary hearing or otherwise establish what testimony he would have offered, we cannot conclude that our confidence in the outcome is undermined by Davis's failure to testify during the penalty phase. Therefore, we affirm the trial court's denial of relief on this claim.

2. "Qualified" Expert on Sexual Abuse in Mitigation
In his second claim of ineffective assistance of penalty phase counsel, Davis argues that his trial counsel was ineffective for failing to present in mitigation the testimony of a qualified expert that Davis suffered from post-traumatic stress syndrome due to sexual abuse suffered by him as a child and while in prison. Specifically, he alleges that the expert presented on this issue was not qualified to render an opinion on the relationship between sexual abuse and post-traumatic stress disorder.
In denying this claim, the trial court found:
Maslanik testified that Dr. McClane did testify during the penalty phase on Post Traumatic Stress Disorder. The Court finds that Dr. McClane testified that Davis was diagnosed with PTSD. McClane also described to the jury the effects of PTSD. Maslanik testified that he believed Dr. McClane's overall qualifications would qualify him to render an opinion on PTSD. Additionally, Dr. Harry Krop, PhD testified that Davis was diagnosed with PTSD and described PTSD to the jury. Accordingly, this claim is DENIED.
We have recognized that "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated." State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002). "[A]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence." Ragsdale v. State, 798 So.2d 713, 716 (Fla.2001) (quoting State v. Riechmann, 777 So.2d 342, 350 (Fla.2000)).
In determining whether the penalty phase proceedings were reliable, "the failure [of counsel] to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." When evaluating claims that counsel was ineffective for failing to present mitigating evidence, this Court has phrased the defendant's burden as showing that counsel's ineffectiveness "deprived the defendant of a reliable penalty phase proceeding."
Asay v. State, 769 So.2d 974, 985 (Fla. 2000) (citations omitted). Moreover, as the Supreme Court recently stated in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003):

*370 [O]ur principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence... was itself reasonable. In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seems "from counsel's perspective at the time."
Id. at 2536 (citations omitted) (third alteration in original).
In contrast to Wiggins, where counsel's proffered mitigation was completely devoid of evidence of the defendant's life history and family background, in this case there was substantial investigation and a comprehensive presentation of evidence during a four-day penalty phase. Davis's defense team presented the testimony of three mental health experts: (1) Dr. Harry Krop, a clinical psychologist with a specialty in child sexual abuse and an expert in forensic psychology, (2) Dr. Henry Dee, a neuropsychologist and an expert in pediatric neuropsychology and substance abuse, and (3) Dr. Thomas McClane, a psychiatrist and expert in the area of forensic psychiatry and pharmacology. All three mental health experts reviewed extensive background information provided to them by Davis's defense lawyers, including photographs of the victim and the crime scene, the transcripts and audiotapes of two statements made by Davis after he was arrested, jail medical records, other police and arrest reports of Davis's, beginning with juvenile records, Davis's HRS records, psychological evaluations done at Peace River Developmental Center, high school records including two psychological evaluations done by members of the school board, and medical and psychiatric records from the Department of Corrections. The experts also reviewed the arrest reports and Florida Department of Law Enforcement (FDLE) records of Davis's stepfather, Brad Hudson, and FDLE and police reports of Eddie Arnold Davis, Davis's biological father. Finally, the mental health experts also either interviewed or reviewed depositions of various people related to the case, including Davis's two aunts, mother, half sister, grandmother, father, stepmother, and stepfather.
Dr. Krop performed neuropsychological testing and a psychosexual evaluation on Davis and testified during the penalty phase that Davis had suffered from physical abuse as a child and had a problem with excessive drinking. Dr. Krop diagnosed Davis with six different mental health disordersdysthymia, substance abuse, post-traumatic stress disorder, learning disability, borderline personality disorder, and antisocial personality disorder. Dr. Dee corroborated Dr. Krop's testimony that Davis was physically abused as a child and had moderate to severe problems with alcohol, and testified that he was aware of the allegations of sexual abuse contained in Davis's prison's records. Both Dr. Dee and Dr. Krop evaluated Davis prior to trial.
Dr. McClane evaluated Davis after Davis was found guilty but before the beginning of the penalty phase. During this evaluation Davis disclosed for the first time that he was sexually abused by his stepfather, Brad Hudson, sometime between the ages of eleven and thirteen. Dr. McClane testified during the penalty phase that this abuse would have had a "serious effect on the development of a child" and had a "profound effect" on Davis. Dr. McClane diagnosed Davis with five mental *371 health disorders. Dr. McClane's primary diagnosis was post-traumatic stress disorder based on the incidents of sexual abuse, followed by chronic alcohol dependence and intoxication at the time of the offense, borderline intellectual functioning, borderline personality disorder, and antisocial personality disorder.
During cross-examination, the State attempted to attack the credibility of Dr. McClane by focusing on the fact that he was not specially trained in the area of sexual abuse of children. Davis argues that Dr. McClane's testimony that Davis suffered from post-traumatic stress syndrome due to sexual abuse as a child was significantly undermined by this cross-examination. Davis contends that trial counsel should have secured an expert in child sexual abuse to testify that Davis was being truthful when he revealed that he suffered from sexual abuse as a child and that Davis suffered from post-traumatic stress as a result of that abuse.
At the postconviction hearing, Davis presented the testimony of Dr. Sherri Bourg-Carter, a psychotherapist with specialties in forensic psychology and child sexual abuse. Dr. Bourg-Carter testified that she believed Davis was telling the truth as to his allegations of child sexual abuse and diagnosed him as suffering from post-traumatic stress disorder based on this abuse. Dr. Bourg-Carter based her diagnosis on an interview with Davis, the results of psychological tests she administered to him, prior psychological exams done on Davis, Department of Corrections records, and the transcript testimony of Dr. Krop and Dr. McClane at the penalty phase. Dr. Bourg-Carter further testified that Dr. Krop could have been qualified as an expert in child sexual abuse and wondered why Dr. McClane interviewed Davis as to the sexual abuse instead of Dr. Krop. Finally, Dr. Bourg-Carter testified that she thought Dr. Krop should have been alerted to the sexual abuse after reviewing the records. In Dr. Bourg-Carter's opinion, there were certain "red flags" in the record that Davis was possibly a victim of sexual abuse, including the nature of the crime itselfthe murder of a young girl.
We conclude that Davis's argument that counsel was ineffective in not securing the testimony of an expert such as Dr. Bourg-Carter is without merit. First, trial counsel's performance was not deficient. This Court has found counsel's performance deficient where counsel "never attempted to meaningfully investigate mitigation" although substantial mitigation could have been presented. See Rose v. State, 675 So.2d 567, 572 (Fla.1996); see also Wiggins, 123 S.Ct. at 2542 (failing to uncover substantial mitigating evidence, including sexual abuse, due to inattention is deficient performance and not reasoned strategic judgment). However, in this case, Davis's trial counsel did conduct a thorough background investigation and present substantial mental health mitigation, including the testimony of three mental health experts, who diagnosed Davis with no less than six different mental health disorders. Thus, this case is more like Asay, where we concluded that trial counsel was not deficient where the defendant had been examined prior to trial by mental health experts and the defendant was simply able to secure a more favorable diagnosis in postconviction. See Asay, 769 So.2d at 985.
"In evaluating the Strickland prong[ ] of deficiency ..., it is [also] important to focus on the nature of the mental mitigation [the defendant] now claims should have been presented." Rutherford, 727 So.2d at 223. In this case, Davis is offering no new mental mitigation testimony. Nor did the postconviction expert rely on information not previously available at *372 trial.[8] Rather, the testimony of Dr. Bourg-Carter presented at the evidentiary hearing is similar to the penalty phase testimony of Dr. McClane. Both mental health experts diagnosed Davis as suffering from post-traumatic stress disorder based on incidents of child sexual abuse. Dr. Krop diagnosed Davis as suffering from post-traumatic stress as a result of physical abuse suffered as a child. Although Dr. Bourg-Carter may be characterized as a "more favorable mental health expert" in that she has substantial expertise in child sexual abuse and its relationship to post-traumatic stress disorder, Davis's trial counsel was not deficient simply because Davis was able to secure a "more favorable" report on postconviction. Asay, 769 So.2d at 986.
Even if counsel was deficient for not having an expert specifically trained in child sexual abuse examine Davis after Davis revealed incidents of sexual abuse, Davis is unable to demonstrate prejudice. As noted above, both Dr. Krop and Dr. McClane testified that Davis suffered from post-traumatic stress syndrome. Consistent with this diagnosis and the other multiple diagnoses of the experts, the trial judge found in his sentencing order that the mitigating factor of extreme mental or emotional disturbance was established and stated that
it is apparent to this Court the defendant came from a dysfunctional family; the defendant is an alcoholic, with low self-esteem; the defendant had an abused, neglected childhood; the defendant has had learning disabilities, which he has overcome; the defendant is immature for his age; the defendant may have an anti-social personality disorder; the defendant may have suffered from post-traumatic stress disorder; the defendant has suffered from chronic depression and anxiety; the defendant has poor impulse control and defective judgment at times and the defendant has suffered from attention deficit hyperactivity disorder. The Court is reasonably convinced this mitigating factor exists and gives it great weight.

(Emphasis supplied.) Thus, there was extensive mental health testimony presented during the penalty phase and the trial judge gave the statutory mitigator of extreme emotional disturbance great weight. Davis cannot establish prejudice such that our confidence in the outcome is undermined. Therefore, we affirm the denial of relief on this claim.

II. PETITION FOR WRIT OF HABEAS CORPUS
Davis raises four claims in his petition for habeas corpus. The first three claims pertain to ineffective assistance of appellate counsel in not raising on direct appeal: (1) the trial court's failure to obtain an on-the-record waiver of Davis's right to testify in the penalty phase; (2) the trial court allowing the victim's mother to remain in the court room; and (3) the trial court admitting inflammatory photographs of the victim. Fourth, Davis argues that his death sentence violates Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

A. Ineffective Assistance of Appellate Counsel
Habeas petitions are the proper vehicle by which to raise ineffective assistance of appellate counsel claims, and *373 the analysis of these claims follows the two-pronged analysis of Strickland as to both deficient performance and prejudice. See Rutherford v. Moore, 774 So.2d 637, 642 (Fla.2000). Because these claims are presented first to this Court in cases involving the imposition of a death sentence, we are called on to analyze the performance of appellate counsel in handling the defendant's direct appeal. A core principle of ineffective assistance of counsel claims is that "appellate counsel will not be considered ineffective for failing to raise issues that have little or no chance of success." Spencer v. State, 842 So.2d 52, 74 (Fla.2003). In other words, "[if] a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Rutherford, 774 So.2d at 642 (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla. 1994)).
In his first habeas claim, Davis argues that his appellate counsel was ineffective for failing to raise on direct appeal the failure of the trial court to obtain an on-the-record waiver by Davis of his right to testify at the penalty phase. Because we have determined that neither the trial court nor counsel erred in not obtaining an on-the-record waiver from Davis, Davis's claim that appellate counsel was ineffective for failing to raise this issue on appeal is without merit.
Davis next argues that appellate counsel was ineffective for not raising on direct appeal that the trial court allowed, over objection, the mother of the victim to remain in the courtroom after testifying. This claim is without merit. Section 90.616, Florida Statutes (1995), provides an exception to the rule of sequestration for a minor child victim's parent, and Davis has been unable to establish how the trial judge abused his discretion in allowing the victim's mother to remain in the courtroom. See Rose v. State, 787 So.2d 786, 804 (Fla.2001) (finding no error in allowing victim's family to remain in courtroom where there was no showing of prejudice to the accused); Gore v. State, 599 So.2d 978, 985 (Fla.1992) (same); see also Stano v. State, 473 So.2d 1282, 1287 (Fla.1985) (finding no error in trial court exempting a deputy clerk from the rule of sequestration where no prejudice to the defendant was shown). Because the underlying claim would not have been successful on direct appeal, appellate counsel cannot be ineffective for failing to raise the issue.
Third, Davis argues that his appellate counsel was ineffective for failing to raise on direct appeal the admission of a series of inflammatory photographs of the victim. Defense counsel objected to the admission of four of these photographs. We have stated that "the admission of photographic evidence is within the trial judge's discretion and a trial judge's ruling on this issue will not be disturbed on appeal unless there is a clear showing of abuse." Rutherford, 774 So.2d at 646 (quoting Pangburn v. State, 661 So.2d 1182, 1187 (Fla.1995)); see also Carroll v. State, 815 So.2d 601, 621 (Fla.2002). Photographic evidence is relevant to depict the circumstances of the crime, "to assist the crime scene technician in explaining the condition of the crime scene," Hertz v. State, 803 So.2d 629, 641 (Fla.2001) (quoting Pope v. State, 679 So.2d 710, 713 (Fla. 1996)), and to "explain a medical examiner's testimony, to show the manner of death, the location of wounds, and the identity of the victim." Rutherford, 774 So.2d at 647 (quoting Larkins v. State, 655 So.2d 95, 98 (Fla.1995)).
We have examined the four photographs that were admitted into evidence *374 over trial counsel's objection and the remaining photographs that were introduced without objection. As to the preserved issue of the four photographs, we conclude that appellate counsel could not have shown that the trial court abused its discretion in admitting those photographs. As to the remaining unobjected-to photographs, counsel can only be deemed deficient for failing to raise this issue on appeal if the admission of the unobjected-to photographs constituted fundamental error:
We have "repeatedly held that appellate counsel cannot be considered ineffective for failing to raise issues which [were] procedurally barred ... because they were not properly raised at trial". [As to an unpreserved issue] if it had been raised on appeal, it would have warranted reversal only if it constituted fundamental error, which has been defined as an error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error."
Rutherford, 774 So.2d at 646 (citations omitted); see also Johnson v. Moore, 837 So.2d 343, 347 (Fla.2002) ("[A]ppellate counsel cannot be deemed ineffective for failing to raise [an unpreserved] issue unless the alleged error constitutes fundamental error."); Valle v. Moore, 837 So.2d 905, 907-08 (Fla.2002) (same).
The admission of these photographs does not constitute error, much less fundamental error, and thus Davis has not demonstrated that any deficiency in appellate counsel's performance "compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Rutherford, 774 So.2d at 647 (quoting Groover v. Singletary, 656 So.2d 424, 425 (Fla.1995)).

B. Ring and Apprendi
Finally, Davis argues that Florida's death penalty statute, section 921.141, Florida Statutes (2003), is unconstitutional based on Apprendi and Ring. We note that Davis's death sentence is supported by both the "committed during the course of a kidnapping and sexual battery" aggravator and a unanimous death recommendation. We have denied relief in direct appeals where there has been a prior violent felony aggravator. See Duest v. State, 855 So.2d 33, 49 (Fla.2003); see also Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (stating that prior violent felony aggravator based on contemporaneous crimes charged by indictment and on which defendant was found guilty by unanimous jury "clearly satisfies the mandates of the United States and Florida Constitutions"). We have also denied relief to postconviction defendants raising this issue. See Jones v. State, 855 So.2d 611, 619 (Fla.2003); Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). Davis is not entitled to relief on this issue.

CONCLUSION
For the above reasons, we affirm the lower courts denial of Davis's rule 3.851 motion for postconviction relief and deny the petition for a writ of habeas corpus.[9]
It is so ordered.
*375 WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
WELLS, J., concurs with an opinion, in which CANTERO and BELL, JJ., concur.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
WELLS, J., concurring.
I write to adopt my concurring opinion in Duest v. State, 855 So.2d 33 (Fla.2003), in respect to the Ring claim.
CANTERO and BELL, JJ., concur.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects with the sole exception of its discussion of the U.S. Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
NOTES
[1] We have jurisdiction. See art. V., § 3(b)(1), (9), Fla. Const.
[2] As nonstatutory mitigation, the court found that Davis was capable of accepting responsibility for his actions and had shown remorse for his conduct and offered to plead guilty; that he had exhibited good behavior while in jail and prison; that he had demonstrated positive courtroom behavior; that he was capable of forming positive relationships with family members and others; that he had no history of violence in any of his past criminal activity; that he did not plan to kill or sexually assault the victim when he began his criminal conduct; that he cooperated with police, confessed his involvement in the crime, did not resist arrest, and did not try to flee or escape; that he had always confessed to crimes for which he had been arrested in the past, accepted responsibility, and pled guilty; that he had suffered from the effects of being placed in institutional settings at an early age and spending a significant portion of his life in such settings; and that Davis obtained his GED while in prison and participated in other self-improvement programs. Although the trial court gave "medium weight" to several of these nonstatutory mitigators, it assigned little weight to most of them.
[3] Davis argued that (1) the trial court erred in admitting two statements that Davis made to law enforcement officers; (2) the trial court erred in allowing the jury to hear a tape of a 911 emergency call made by the victim's mother; (3) the State improperly injected irrelevant matters and improper argument into the trial and exploited the emotional displays of its witnesses; (4) the trial court erred in overruling defense objections to the standard jury instructions on reasonable doubt and premeditated murder; (5) the trial court erred in permitting the State's mental health expert to examine Davis; (6) the jury recommendation of death was tainted by a number of trial errors; (7) the trial court erred in denying his proposed jury instruction on nonstatutory mitigating factors; (8) the trial court erred in instructing the jury on the "avoid arrest" aggravator and the sufficiency of the evidence in support thereof; (9) the trial court erred in finding that Davis's control release status supported the finding that he was under sentence of imprisonment at the time of the murder; and (10) the trial court erred in instructing the jury on the heinous, atrocious, and cruel aggravator.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)
[5] Davis argued: (I) guilt phase counsel was ineffective in violation of the Sixth and Fourteenth Amendments for (a) failing to move for a mistrial upon allowing an enlarged photograph of the victim's body to remain in front of the jury, (b) failing to adequately investigate the criminal past of a key witness, (c) failing to present the defense of voluntary intoxication, (d) failing to procure a change of venue, (e) failing to investigate and prepare DNA evidence, (f) failing to effectively suppress defendant's confession or alternatively to effectively argue its inherent unreliability to the jury; (II) penalty phase counsel was ineffective in violation of the Sixth and Fourteenth Amendments for (a) failing to cross examine Alicia Riggall, Davis's control release supervisor, during the penalty phase of the trial, (b) failing to call Davis to testify at the penalty phase of the trial, (c) failing to present expert testimony on post-traumatic stress disorder, (d) failing to sufficiently develop voluntary intoxication as a mitigator, (e) failing to provide physical evidence of organic brain damage, (f) failing to call Brenda Reincke, Davis's neighbor to testify, (g) failing to move for a competency evaluation; (III) a conflict of interest between counsel and Davis prevented counsel from rendering effective assistance; (IV) the rules prohibiting counsel from interviewing jurors deprived Davis of his constitutional rights; (V) he was denied a meaningful adversarial testing by counsel's conceding guilt without consultation; (VI) Davis may be incompetent at the time of execution; (VII) Florida's capital sentencing structure is unconstitutional on its face and as applied; (VIII) the trial contained numerous procedural and substantive errors which cannot be harmless when viewed as a whole; (IX) he was denied his rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (X) execution by electrocution is cruel and unusual punishment; (XI) lethal injection is cruel and unusual punishment; (XII) Brim v. State, 695 So.2d 268 (Fla.1997), and Murray v. State, 692 So.2d 157 (Fla.1997), establish that Davis's conviction violates the Eighth and Fourteenth Amendments.
[6] Huff v. State, 622 So.2d 982 (Fla.1993).
[7] The trial court granted an evidentiary hearing on claims IB, IC, IE, IIA (as orally amended), IIB, IIC, IIE, IIF, II G, III, V, and VIII. The trial court found claims IA, ID, IF, VII, and XII to be procedurally barred and denied a hearing. The trial court determined that claims IID and IX were conclusively refuted by the record and denied a hearing. The trial court noted that claim IA was conclusively refuted by the record as well as being procedurally barred. The trial court denied claim IV without a hearing because the defendant never made a motion to interview jurors and thus, the claim had no merit. The trial court denied claim VI without a hearing because the defendant was not under an active death warrant. Claim X was denied as moot and claim IX was denied without a hearing because this Court in Sims v. State, 754 So.2d 657 (Fla.2000), decided lethal injection does not constitute cruel and unusual punishment.
[8] In fact, Dr. Bourg-Carter conceded during the postconviction proceedings that she actually reviewed less prior history than either Dr. Dee or Dr. Krop and would not have been qualified with what she reviewed to testify comprehensively in a penalty phase.
[9] We also reject the remainder of the claims contained in Davis's postconviction motion and petition for writ of habeas corpus. Davis's claim that his Eighth Amendment rights will be violated because he may be incompetent at the time of execution is premature and without merit as Davis is not under active death warrant at this time. See Hunter v. State, 817 So.2d 786, 799 (Fla. 2002); § 922.07, Fla. Stat. (2003); Fla. R.Crim. P. 3.811. Finally, Davis's claim that cumulative error warrants a new trial and penalty phase is without merit as Davis has been unable to demonstrate any error, either individually or collectively. See Atwater v. State, 788 So.2d 223, 228 n. 5 (Fla.2001); Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999).